Pages 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE

MARC SILVER, HEATHER PEFFER,       )
and ALEXANDER HILL,                )
individually and on behalf of      )
all others similarly situated,     )
                                   )
            Plaintiffs,            )
                                   )
   VS.                             )       No. C 20-0633 SI
                                   )
BA SPORTS NUTRITION, LLC,          )
                                   )
            Defendant.             )
_____    )       San Francisco, California
                                           Friday, September 4, 2020


**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:  (via Zoom Video Conferencing)

For Plaintiffs:            KAPLAN FOX & KILSHEIMER LLP
                           1999 Harrison Street, Suite 1560
                           Oakland, California 94612
                    BY:  **LAURENCE D. KING, ESQ.**
                         **MARIO M. CHOI, ESQ.**

                           KAPLAN FOX & KILSHEIMER LLP
                           6109 32nd Place, Northwest
                           Washington, DC 20015
                    BY:  **MAIA C. KATS, ESQ.**


            (Appearances continued on next page)


Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
               Official Reporter - U.S. District Court

**APPEARANCES:** (continued via Zoom Video Conferencing)

For Defendant:

                          BRAUNHAGEY & BORDEN LLP
                          351 California Street, 10th Floor
                          San Francisco, California 94104
                BY: **MATTHEW BORDEN, ESQ.**
                   **TRACY O. ZINSOU, ESQ.**

| | |
|---|---|
| 1 | **Friday - September 4, 2020**                              **10:34 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling civil action 20-633, Silver, et |
| 5 | al. versus BA Sports Nutrition, LLC. |
| 6 | Counsel, please state your appearances for the record, |
| 7 | beginning with the plaintiff. |
| 8 | **MR. KING:**  Good morning, Your Honor.  For plaintiffs, |
| 9 | Lawrence King, Maia Kats and Mario Choi.  Ms. Kats will be |
| 10 | presenting our argument today. |
| 11 | **THE COURT:**  Good morning. |
| 12 | **MR. BORDEN:**  Good morning, Your Honor.  Matt Borden |
| 13 | and Tracy Zinsou on behalf of the defendant. |
| 14 | **THE COURT:**  Good morning. |
| 15 | Well, welcome.  This is the motion to dismiss the First |
| 16 | Amended Complaint.  I've read your papers, which were extremely |
| 17 | vitriolic.  I find that off-putting, and I hope that in future |
| 18 | you can make them less so.  The *ad hominem* attacks are not |
| 19 | useful.  These are hard enough questions without having to deal |
| 20 | with such childish accusations.  So, please, calm down in the |
| 21 | future. |
| 22 | I have some questions specifically for you, and then you |
| 23 | can add whatever you would like to your papers. |
| 24 | But, in the first instance for defendants, the papers do |
| 25 | not clearly address plaintiff's separate, I guess, now |

1  standalone allegations that the fruit-based labeling is

2  deceptive separate from whether there's a violation of FDA

3  regulation.  So what is your position on that?

4          MR.  BORDEN:  Thank you, Your Honor.

5      The fruit-based regulation -- well, putting the

6  fruit-based regulation aside, the product obviously does not

7  contain fruit.  No sports beverages contain fruit whatsoever.

8          THE COURT:  How do we know that?

9          MR.  BORDEN:  Well, they were only able to come up

10  with one example of a sports beverage that contains fruit, and

11  that is the Gatorade Juiced product.  It's been on the market

12  maybe a couple of months.  It specifically says "juice" in the

13  name because it's calling attention to the fact that this thing

14  has juice in it, and it's trying to distinguish itself from

15  BodyArmor, from Powerade, from all the other Gatorade products.

16  None of these products have juice in it.

17          THE COURT:  Why do they put fruits on the label?

18          MR.  BORDEN:  Because that's the flavor of the

19  product.  And everybody -- everybody understands that.

20  These -- these plaintiffs bought the product they've alleged

21  repeatedly.  They had to have understood that it did not have

22  any fruit in it.

23      It's -- it's very different from a situation where you

24  would expect something to have fruit in it, and that's where

25  the regulation applies.  And, you know --

1        **THE COURT:**  How do we know, by the way, what people

2   expect to have in what?  That's a concern I have for both of

3   you about the regulation.

4        Are there cases that say, well, this is how you know

5   what -- what product is expected to have what ingredients in

6   it?

7        I'm not a big sports drink person, so when you say no

8   sports drinks have fruit in them, I don't know.  How do we know

9   that?

10        **MR.  BORDEN:**  Well, you can also see from the

11   complaint itself they have all these pictures of in-store

12   displays.  And it's not in the refrigerated section like a

13   fruit juice.

14        And, I mean, you can just -- you can look at the physical

15   product and see that it doesn't have fruit in it.  And if you

16   buy it repeatedly and you drink it, you also know that it

17   doesn't have fruit in it.  I don't think anybody would -- would

18   think that it had fruit in it.

19        And, also, if you look at the label itself -- and I know

20   that you're familiar with it because you pasted it into the

21   last decision -- it says on it "natural flavors and

22   sweeteners."  And it says it on the area of the label with the

23   coconut water and the electrolytes and the other -- the other

24   representations that plaintiffs said that they read and relied

25   on.

1    So you know that they had to have read that it said

2    "natural flavors and sweeteners."  That is -- that's another

3    way that we know that these plaintiffs understood that it

4    doesn't have fruit in it.

5         **THE COURT:**  Natural flavors means it doesn't have

6    fruit in it?

7         **MR. BORDEN:**  It has natural flavors.  I mean, it says

8    that it's flavored.  It doesn't say, you know, contains fruit.

9    I mean, if you read the ingredients you know exactly what's in

10   the product.

11        **THE COURT:**  Plaintiffs, do you have any cases that

12   tell us how we know what's reasonably normally expected to be

13   in a product?

14        **MS. KATS:**  Good morning, Your Honor.

15        Well, I think that's precisely the point, that we can't as

16   a matter of law assume that we know what plaintiffs think here

17   when there is a debate about it.

18        And we know what our plaintiffs thought.  We know what the

19   FDA says about how it should not be deceptive, which is that --

20   defense counsel held up a can of BodyArmor, a bottle, that was

21   not very representative of most of them.

22        If you look at our opposition, you will see that they

23   plaster it in images of fruit.  And they name the drink after

24   fruit for a reason, because they want people to think that

25   there are fruits in them.

1          And this was precisely why Gatorade and PepsiCo did the

2     right thing when they inferred that there were fruits in them

3     when they weren't there.  And in characterizing amount they

4     used the word "flavor."

5          When Coke Cherry -- nobody thinks that that's a real fruit

6     juice under Mr. Borden's analysis -- when they put a picture of

7     a cherry on the front of the label they say "flavored."

8          The regulation is clear as day, Your Honor.  There is no

9     exemption.  When the FDA wants to exempt someone from a

10    regulation they so specify it.  A sports drink is a food.  And,

11    therefore, they must follow the FDA regulation because they

12    intended for plaintiffs and consumers to think this.

13         Now, what they actually think we just -- that's -- that's

14    perhaps a subject of discovery and a survey on consumer

15    perceptions, but it's not something, clearly, that can be

16    thrown out, in my view, Your Honor, with all due respect, as a

17    matter of law.

18         **THE COURT:**  Do you think -- do you think natural

19    flavors and naturally flavored are two different things?

20         **MS. KATS:**  I think that that is a red herring, Your

21    Honor.  Defense counsel spent a page and a half on that in

22    their brief.  That is not the issue.

23         The issue here is that the whole bottle is plastered with

24    fruits; right.  They're there for a reason: because people

25    think fruits are healthy.  And their name, the nomenclature,

1    the whole naming protocol is fruit-based.

2          And then everyone knows that vitamins come from fruits.

3    And there's vitamins all over this.   Nowhere does it say that

4    this is artificially fortified.   Their artificial

5    ingredients -- all of these vitamins are artificially fortified

6    here.

7          And so this is -- this is case law textbook deceptive

8    in -- in our view, Your Honor.

9          **THE COURT:**   Casebook.   That's why I keep asking, do

10   you have any cases that will say, well, in a sports drink you

11   would or would not common -- what is it, commonly expect it to

12   contain a flavor?

13         **MS. KATS:**   Well, Your Honor, there is no separate

14   category for sports drinks.   They are a food.   They are food

15   like any other food.   They fall under this regulation.   To be

16   exempt it would have to be expressed.

17         And you have BodyArmor's arch competitor here, Gatorade,

18   Gatorade, when it pictures fruits and it refers to fruit but it

19   doesn't contain those fruits, uses the word "flavored" so as

20   not to be deceptive.

21         With all due respect, I think the question should be

22   flipped.   Where is the authority?   Given that defendant is

23   moving to dismiss this as a matter of law, where is the

24   authority saying they're exempt from this regulation?   There is

25   none.   It's made up, Your Honor.

1              **THE COURT:**  Mr. Borden.

2          **MR.  BORDEN:**  Your Honor, the FDA regulations

3    specifically say that you can use the images of fruits to

4    convey that your product is fruit flavored.  And that's in the

5    regulation itself.  And all that BodyArmor is doing is

6    following the regulation.

7          And, as you point out, even if the regulation were to

8    apply, it's a distinction without a difference, this idea of

9    naturally flavored versus natural flavors.  It's -- it's the

10   same thing, and it's a quarter inch away.

11         They read this and they understood the precise information

12   that the FDA requires people to disclose on their labels.  And

13   so it's -- there's no way that they could plausibly assert that

14   they were misled, because BodyArmor discloses the very

15   information that the FDA requires.

16             **THE COURT:**  Do you have any cases that talk about

17   pictures of fruits on labels?

18         **MR.  BORDEN:**  I'm trying to think.  I do not think I

19   have a case with a picture of a fruit on a label.

20         I do think that in the *Gerber* case there was pictures of

21   fruit on the label.  The product was called Fruit Juice Snacks.

22   And it didn't -- it didn't have the pictures of the fruits

23   that -- it had fruit juice, but it didn't have the pictures of

24   the fruits that were on the front of the label.  So in that

25   case I understand that the Ninth Circuit said there was

1  potential that it could be misleading.

2          **THE COURT:**  Was there any fruit in fruit juice on

3  *Gerber*?

4          **MR.  BORDEN:**  Yeah, there was fruit in fruit juice.  I

5  think there was grape juice and apple juice, but it didn't

6  have -- you know, there were other fruits on the label of the

7  product, and it didn't have those fruits.  And that's what it

8  found to be misleading.  They were using, sort of, a cheaper

9  fruit product than -- than maybe what consumers would expect

10 from seeing an image on the front of a product that was called

11 Fruit Juice Snacks.

12      This is not called fruit juice snacks.  This is

13 banana-strawberry flavor.  There's no banana juice.  Nobody

14 thinks there's a banana juice product.

15      And, you know, the names -- I mean, some of the names like

16 "tropical fruit punch," I mean, these are not things that are

17 actual real fruits.  And -- and a disclosure --

18          **THE COURT:**  Pardon me?  What did you just say?

19 Tropical fruit punch?

20          **MR.  BORDEN:**  Yes.

21          **THE COURT:**  Is not real fruit?

22          **MR.  BORDEN:**  Well, it's -- like what fruit would --

23 would a person expect to be --

24          **THE COURT:**  Mangoes and guavas and papayas.  No?

25          **MS. KATS:**  That's what's pictured, Your Honor.

1      **MR.  BORDEN:**  The -- there's coconut water in the

2    product.  That is the -- that is what the product's base is and

3    that's what it says.  And it has all the flavors that -- that

4    are depicted on the label.

5      There's just no -- I mean, it says natural flavors and

6    sweeteners in the ingredients.  It says, you know, natural

7    flavors right on the side.  It -- this product does not purport

8    to be a fruit juice in any way.

9           **THE COURT:**  Can you tell me this one?  It says

10   "natural flavors."  What does that mean?  What is a natural

11   flavor?  Like banana, what's a natural flavor banana?

12         **MR.  BORDEN:**  I don't know exactly what they use.

13   Typically, you would buy it from someone who is a flavor

14   manufacturer who will say -- give you a certificate of

15   authenticity that says this is natural banana flavor.

16         **THE COURT:**  What does natural -- what does natural

17   mean in that context?

18         **MR.  BORDEN:**  Presumably it's not made from a

19   synthetic product.

20         **THE COURT:**  But it's not made from a banana?

21         **MR.  BORDEN:**  I'm, frankly, not sure.  But I -- but I

22   imagine that -- I mean, I'm more familiar with the concept of

23   vanilla.  So vanilla flavor, for example, can be Vanillin is

24   what gives it the flavor, and that can be synthesized without

25   using the actual vanilla bean.

1      So I'm assuming that you could have similar things for

2  other flavors and fruit flavors as well.  Many things are fruit

3  flavored.

4          **THE COURT:**  But not -- the fruit flavors are not

5  produced from fruit?

6      **MR.  BORDEN:**  I actually don't know.  It could be that

7  you could use the fructose from a grape to derive banana

8  flavor.  I don't really know.

9          **THE COURT:**  Ms. Kats, you were gasping there.  Is

10  there anything you --

11      **MS. KATS:**  I would just like to point out two things

12  in response.

13      Mr. Borden, I think, frankly, slipped when he said that

14  this is banana-strawberry flavor.  That's precisely our point.

15  It should say "flavor" and not "banana-strawberry."

16      And if an expert in food law doesn't know what it means,

17  if it doesn't mean the fruit, how does your average Joe or Jane

18  in the supermarket know what it's supposed to mean?  They

19  don't.  And that's why we need discovery to establish that

20  through a consumer survey, Your Honor.

21          **THE COURT:**  Okay.  I think I had one more --

22          **MR.  BORDEN:**  Yeah, just -- sorry, Your Honor.

23          **THE COURT:**  Go ahead.

24          **MR.  BORDEN:**  One more quick point is, the "natural

25  flavors" is also defined by the FDA.

1          THE COURT:  What do they call it?

2          MR.  BORDEN:  I can look up the definition and provide

3      it to you.  Why don't we continue with the hearing.  Somebody

4      will send it to me.

5          THE COURT:  Okay.  I had one more question.

6          Plaintiffs rely on *Fisher v. Monster Beverage*, where they

7      advertise that their drinks hydrated like a sports drink, and

8      the drinks had a lot of caffeine.

9          How is *Fisher* distinguishable from your case, Mr. Borden?

10         MR.  BORDEN:  Sure.  So our drink -- *Fisher* involved

11     an energy drink like Red Bull or one of those kind of drinks

12     that has a lot of caffeine and has a lot of sugar in it.  And

13     what it said was it hydrates like an energy drink.  I mean,

14     like a -- like a sports drink.

15         THE COURT:  Like a sports drink.

16         MR.  BORDEN:  Pardon me, yes.

17         And -- and our product is a sports beverage.  And it says

18     "superior hydration."  And there's no -- as you pointed out in

19     the prior order, there's no comparison to anything.  There's no

20     way to measure superior hydration versus anything else.

21     Whereas, the Court in *Fisher* said "hydrates like a sports

22     drink" is something that we can -- we can think about because

23     this -- it's a comparison to something actual.

24         And they were also concerned that the amount of caffeine

25     that was in the beverage in that instance was actually

1    dehydrating and was a concern.

2        As the Court pointed out in its prior order, there's

3    nothing that, you know, says that BodyArmor doesn't hydrate.

4    There's no allegations that it -- it's not an effective

5    hydration beverage.  It doesn't have any caffeine in it.

6    And -- and it doesn't make any comparison to any other product.

7        And so when you just have this word "superiority" lurking

8    out there -- this is what your prior order said, this is what

9    the case law says -- you have to say this is superior because

10   we have a study that shows that we have, you know, better

11   hydration than Gatorade, or tests show that our product is more

12   superior than water because -- you know, hydration studies or

13   some kind of reference to an actual study to something that is

14   a real comparator and a basis for comparing so that you have a

15   statement that can be proven true or false.

16       "Superior hydration" cannot be proven true or false.

17   "Hydrates like a sports beverage" could be, you know,

18   potentially measured by looking at how sports beverages hydrate

19   and comparing it to the way that the product there hydrates.

20   And so that's the distinction between *Fisher* and our case.

21       **THE COURT:**  All right.  Thank you.

22       Ms. Kats, anything?

23       **MS. KATS:**  Well, I have a lot to say, Your Honor,

24   about *Fisher v. Monster*, but mostly I'm perplexed by where

25   there was any sort of scientific study alleged in *Fisher versus*

1    *Monster*.  There isn't.

2         There is no requirement of making a comparison that is

3    coupled on a label with a scientific reference or a study.

4    That is just something that has been manufactured, with all due

5    respect.

6         But in *Fisher*, what *Fisher* stands for is that the basic

7    tenets of UCL and GBL deception claims apply equally to the

8    hydration claims.  Simply because the word "hydration" is in

9    there it doesn't suddenly take it out and put it into a

10   different category of legal claims.  It just doesn't.

11        And what the Court, the Ninth Circuit in *Fisher* did was to

12   look at the claim "hydrates" or "rehydrates like a sports

13   drink."  And when it reversed the trial court, it found that

14   there were two bases that plaintiffs stated plausible claims.

15   The first was because they alleged that *Monster* lacked certain

16   ingredients that sports drinks have.  And the second -- and

17   those scientific studies there.  Second and independent of the

18   first is because *Monster* had an ingredient that links with

19   harm, according to plaintiffs.

20        That's the same as what plaintiffs are doing here.

21   They're alleging that, as one of their claims anyway, that the

22   added sugar links with harm such that this is not superior and

23   that superior hydration is not good for you.

24        It also makes clear, *Fisher* makes clear that hydration

25   is -- and this is what the NAD found in analyzing these claims.

1   Hydration is just -- we're not claiming here that BodyArmor is

2   actionable, the advertising, because it's a super drink.  That

3   standing alone would be puffery.

4        Plaintiffs are claiming that it's actionable because it's

5   "superior hydration."  And hydration is a term with inordinate

6   meaning to consumers of sports drinks.  Everyone knows this.

7   BodyArmor knows it.  PepsiCo and Gatorade knows it.  The

8   Attorney General of California knows it.  The NAD knows it.

9   The CDC, the FDA, everyone is talking about what sports drinks

10  mean.

11       I'll say something else about *Fisher*.  It makes clear that

12  there's no requirement on plaintiffs, in a hydration claim, of

13  proving falsity.  There the Court roundly rejected this notion

14  that plaintiff, which is just absolutely backwards, has a

15  burden to disprove defendant's hydration claims.  They don't.

16       And in the Court's own words:

17           "Although the statements upon which plaintiffs relied

18       were not strictly false, it is plausible that they were

19       misleading, which is all California law required."

20       And so the claims here really echo those in *Monster*.

21  Plaintiffs are claiming that the -- the defendant's marketing

22  is misleading because superior hydration, whether alone or in

23  the context which defendant continually ignores, in the context

24  of all these other prominent labeling claims that tether the

25  superior hydration characteristic to defendant's proprietary

1  formula, the vitamin content, the fruits, the natural

2  flavoring.  And not just that, Your Honor, but they on the

3  label exhort consumers to ditch their outdated sports drinks

4  and upgrade from their outdated sports drinks to Gatorade --

5  I'm sorry, to BodyArmor.

6      And so plaintiffs are saying they got the message.  That's

7  all they're saying.  They got the message that BodyArmor's CEO

8  and founder wanted them to get, that this is superior at

9  hydrating, that it's more modern than Gatorade's outdated,

10  antiquated formula, that it does better at hydrating them.  And

11  that this is riddled with omissions if not just false.  And

12  that it doesn't mean what they believed it to mean, which is

13  that this was verifiable, objective, measurable superiority for

14  which they paid a majorly handsome price differential, Your

15  Honor.  It's more expensive.

16      And so, again, this is material to plaintiffs because

17  plaintiffs believe that hydration causes an effect.  That

18  effect is what?  That effect is that their workout's going to

19  be better, they're not going to have cramping, they're not

20  going to have headaches, their fatigue will be less.

21      And, as BodyArmor knows, there's just no basis for that

22  advertising.  And -- but plaintiffs believed it.  They got the

23  message.  They know what BodyArmor was trying to advertise.

24  They heard it.  They believed it.  They relied on it.  They

25  paid a price premium.  They bought the thing in the first

```
 1    instance.

 2          All this is so much more than what plaintiffs in Fisher

 3    alleged, Your Honor.  And the Court there said they had more

 4    than met their burden.

 5                 THE COURT:  All right.  Thank you.

 6                 MR.  BORDEN:  So, Your Honor, can I just --

 7                 THE COURT:  Yes.

 8                 MR.  BORDEN:  -- refer you back?  And this is part of

 9    the problem here.  And this is page 9 of your order dismissing

10    the puffery claims here.

11          These are -- I'm quoting the Court's order.  These are

12    vague, general -- pardon me.  "These are general vague

13    statements about product superiority."  And then you go on to

14    say, quote, Plaintiffs do not allege that BodyArmor is not, in

15    fact, hydrating.  For example, plaintiffs do not allege that

16    BodyArmor is dehydrating.  In addition, BA has not made a

17    specific measurable advertisement claim of product superiority

18    based on product testing.

19          And it's the "based on product testing" part.  You go on

20    to cite about 15 cases.  There's Ninth Circuit cases talking

21    about all sorts of measurable things like brightness, gas

22    mileage -- that's a District Court case by Judge Koh --

23    computer processor speed, all these things that can be tangibly

24    measured.  And, you know, by saying superior gas mileage to a

25    previous model's that was puffery.
```

1    You need to -- in order to have something that is not

2    puffery involving that term "superiority," which is just this

3    vague generalized thing that people say about their products,

4    and they're allowed to say about their products.  Look, this is

5    a -- BodyArmor is a good product.  And they're allowed to have

6    athletes advertise it.  They're allowed to say that it provides

7    superior hydration because it's a good product.  They're

8    allowed to say good things about their products.

9         And this is one of the other sort of difficulties in this

10   case.  And we haven't really talked about the halo claims, and

11   I'm not sure the Court even wants to, but, I mean, I'm happy to

12   address them if you want.

13        But it's very troubling when you make a product and you

14   have these amorphous allegations where they're just trying to

15   take any advertising language and say that it's somehow

16   misleading.  And their theories, you know, keep changing and --

17   and they come up with new ones.

18        And none of it's misleading.  This is a -- everybody

19   understands that these energy drinks are -- are -- I mean,

20   these sports drinks are used to replenish your body when you're

21   engaged in physical activity.  That's how everybody uses 'em.

22   And it is a really good product for that.

23        And it is all natural.  It's -- in terms of its flavors

24   and colors.  It is made with coconut water and has a great deal

25   of potassium, more than its competitors.  And that's how it's

1   differentiated itself in the market.

2        I did have someone pull the reg for you.  Artificial

3   flavors.  And it's 21 C.F.R. 501.22(a)(1) -- or (a)(3).

4        **THE COURT:**  Would you start that whole thing over.  21

5   C.F.R. what?

6        **MR.  BORDEN:**  501.22(a)(3).  And I can read it to you.

7        "The term natural flavor or natural flavoring means

8        the essential oil, oleoresin, essence or extractive,

9        protein hydrolysate, distillate, or any product of

10       roasting, heating or enzymolysis" -- my apologies to the

11       court reporter -- "which contains the flavoring

12       constituents derived from a spice, fruit or fruit juice,

13       vegetable or vegetable juice, edible yeast, herb, bark,

14       bud, root..."

15       I don't need to read you the whole thing.  But that's the

16   general flavor of it, if you will.

17       **THE COURT:**  Well, now we know.  Thank you.

18       **MR.  BORDEN:**  Well --

19       **THE COURT:**  They didn't mention anything about bananas

20   though.

21       **MR.  BORDEN:**  It may be -- it may be coming down the

22   pike.  I don't know.  It's a long -- it's a long regulation.

23       But, you know, in your last order you cited about 15

24   cases, you know, for this principle that there has to be some

25   kind of real comparator.  So, I mean, this is a recycling of

1    the same -- same arguments.  I mean, I can walk through all

2    the --

3           **THE COURT:**  Well, you know, the thing that strikes me

4    as different this time from the last time is the heavy emphasis

5    on the pictures of the fruits on the labels and the conjunction

6    of that to all the other things you're talking about.

7        That -- that's an issue that I don't -- I didn't at least

8    recognize being so forcefully asserted before, and I just --

9    I'm not sure that I've heard a real response to that from you.

10          **MS. KATS:**  Your Honor --

11          **MR.  BORDEN:**  Well, so the idea of fruit somehow

12   giving rise to superior hydration doesn't -- I mean, that's

13   not -- I don't understand why you would say because it has a

14   picture of a slice of orange on it you would think that it

15   would be any more hydrating than anything else.

16       And it still doesn't answer the question of a comparison,

17   right.  There's still no comparison to superior hydration.  And

18   that's the -- I mean, that's the -- the big fault is that you

19   can't -- unless you're saying that it's superior to something,

20   and unless you're saying why it's superior to something -- I

21   mean, it could be superior hydration because it has potassium

22   in it.  It could be superior hydration for any number of

23   reasons.  Because it tastes better.  Because it's more natural.

24   Because it doesn't -- it's not that bright neon Yellow Dye No.

25   5 Gatorade.

1        It is not a comparison to anything.  And some of these

2   plaintiffs even said they thought it was a comparison to water.

3   So -- so it's just not a comparison.

4        You know, you can say -- if I say, you know, I'm the best

5   lawyer in the world, you know, I think everybody would take it

6   with somewhat of a grain of salt and understand that I'm not

7   really saying, you know, going back since the beginning of time

8   that I'm better than every other lawyer in the world in some

9   kind of objective and measurable way.  I'm just saying I'm

10  good.

11       **THE COURT:**  Well, if you say "I'm the best lawyer in

12  the world" nobody would believe you because there wouldn't --

13  there wouldn't be a way to assess that.  But it wouldn't be

14  noncomparative.  It would be comparative.

15       **MR.  BORDEN:**  Well, yes, I suppose so.

16       And there are some -- some comparisons that -- and in what

17  way would I be the best lawyer in the world?  Maybe I am the

18  best lawyer in the world for, you know, like forgiving clients

19  for payments.  Or maybe I'm the best lawyer in the world for,

20  you know, handholding clients, and maybe it's not, you know, in

21  the courtroom itself.

22       There's lots of ways you could be the best lawyer in the

23  world.  And that's one of those sort of vague statements.  And

24  I agree that nobody would believe me.  But superior hydration

25  doesn't even have a comparator on there.  And that's why you've

1  seen these cases.  I mean, they're unable to cite any case

2  with --

3          THE COURT:  Well, there's inferior, which means worse

4  than average; right?  And then there's superior, which means

5  better than average; right?

6          MR.  BORDEN:  Average what?  You still have to --

7          THE COURT:  How about hydration?

8          MS. KATS:  Your Honor, may I?

9          THE COURT:  Sure.  But we need to wrap this up pretty

10  quick.

11          MS. KATS:  That's why I'm trying to get a word in

12  here.

13      So if Mr. Borden -- I think the First Amended Complaint is

14  different from the complaint, the original complaint in many

15  ways beyond just the fruit.  We have laid out very clearly why

16  plaintiffs' claims are reasonable, whether it's NAD's ruling

17  finding that their perceptions as pled are reasonable, or the

18  California Attorney General or the FDA in the jelly bean rule

19  saying don't fortify junk food.  Sugar food's included.

20      But if I may, just responding to Mr. Borden's statement

21  that if I say I'm the best lawyer in the world what does that

22  mean?  I may be in some ways.

23      Well, that's the point here.  BodyArmor is saying that

24  it's superior, and then it spells out conspicuously on the

25  label why it's superior.  It has a comparator in addition to

1  that.

2       Now, we don't even have to get to the comparator though.

3  But all of these vitamins, they're saying, are what make it

4  superior.  And I'm reading right now.  It's the sports drinks

5  for today's athlete, providing superior hydration by combining

6  all of these things.  So potassium, the various vitamin levels,

7  all of that.  And then it goes on to say, on the comparator

8  front, which is not required but definitely here, "It's time to

9  ditch your outdated sports drink and make the switch to

10  BodyArmor."

11       That gives meaning to superior hydration, Your Honor.  And

12  defendant would like to pretend that the words "superior

13  hydration" -- we definitely believe they're actionable because

14  hydration is a term with meaning.  And it is studied again and

15  again by scientists as to how to get the best hydration.  And

16  sports people know that, Your Honor.  We've cited infinite

17  research on hydration in sports drink.

18       But more than that, these words are not in abstract.  They

19  don't appear in a vacuum.  You have to look at it in context.

20  And that's where the FAC differs from the original complaint.

21       And we thought that the original complaint was

22  deficient -- was sufficient.  Your Honor found it deficient.

23  So we went back and we filled in all the details.  We filled in

24  all the other claims on the bottom.

25       It's just nonsense to say that this was meant -- had no

1    meaning.  As the NAD found, one reasonable consumer takeaway

2    from BodyArmor's marketing is that the product provides better

3    hydration.  Hydration is not a subjective product

4    characteristic.  Consumers understand that sports drinks are

5    intended to replenish electrolytes.  It would be reasonable for

6    consumers to believe that the claim "better hydration" is an

7    objective claim about a product characteristic.

8         That is from the industry expert on advertising, Your

9    Honor.  If they can believe that, how is it unreasonable that

10   plaintiffs believe that?

11            **THE COURT:**  All right.  Thank you, all, very much.

12   This matter will be submitted and we will get back to you

13   presently.

14        Do we have other dates right now?

15            **MS. KATS:**  Your Honor asked us to submit the CMC

16   statement so we --

17            **THE COURT:**  For today?

18            **MS. KATS:**  Yes.

19            **THE COURT:**  Well, I think we should probably just

20   continue that CMC to, like, three weeks from now.

21        Teddy?  Teddy, what would that be?

22            **THE CLERK:**  September 25th.

23            **THE COURT:**  Are you available on Friday,

24   September 25th, at about 3:00?

25            **MS. KATS:**  Yes, Your Honor.

1          **MR.  BORDEN:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  And if the time changes, we'll let

3    you know.  But right now we'll stick it for 3 o'clock on that

4    date.

5          All right.  Thank you very much.  The matter will be

6    submitted.

7          **MS. KATS:**  Thank you.

8          **MR.  BORDEN:**  Thank you very much, Your Honor.

9          (At 11:10 a.m. the proceedings were adjourned.)

10                              - - - - -

11

12                    <u>**CERTIFICATE OF REPORTER**</u>

13          I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15    DATE: Thursday, September 10, 2020

16

17

18              *Katherine Sullivan*

19    _____

20          Katherine Powell Sullivan, CSR #5812, RMR, CRR
                        U.S. Court Reporter

21

22

23

24

25