1   J. Noah Hagey, Esq. (SBN: 262331)
       hagey@braunhagey.com
2   Matthew Borden, Esq. (SBN: 214323)
       borden@braunhagey.com
3   David H. Kwasniewski, Esq. (SBN: 281985)
       kwasniewski@braunhagey.com
4   Tracy O. Zinsou, Esq. (SBN: 295458)
       zinsou@braunhagey.com
5   Ellen V. Leonida, Esq. (SBN: 184194)
       leonida@braunhagey.com
6   BRAUNHAGEY & BORDEN LLP
    351 California Street, 10th Floor
7   San Francisco, CA 94104
    Telephone: (415) 599-0210
8   Facsimile: (415) 599-0210

9   ATTORNEYS FOR DEFENDANT
    BA SPORTS NUTRITION, LLC

10

11                    **UNITED STATES DISTRICT COURT**

12                  **NORTHERN DISTRICT OF CALIFORNIA**

13

14

15  MARC SILVER, ALEXANDER HILL,           Case No: 3:20-cv-00633-SI
    individually and on behalf of all others
16  similarly situated,                    **DEFENDANT BA SPORTS**
                                           **NUTRITION, LLC'S NOTICE OF**
17              Plaintiffs,                **MOTION AND MOTION FOR**
                                           **SUMMARY JUDGMENT**
18       v.
                                           **Date:**     June 11, 2021
19  BA SPORTS NUTRITION, LLC,              **Time:**     10:00 a.m.
                                           **Judge:**    Hon. Susan Illston
20              Defendant.                 **Ctrm.:**    1, 17th Floor

21                                         Complaint filed: January 28, 2020

22

23

24

25

26

27

28

MOT. FOR SUMMARY JUDGMENT

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on June 11, 2021 at 10:00 a.m., in Courtroom 1 of the above captioned Court, located at 450 Golden Gate Avenue, 17th Floor, San Francisco, CA 94102, Defendant BA Sports Nutrition, LLC ("BodyArmor") will and hereby does move this Court for an order granting summary judgment in favor of BodyArmor pursuant to Federal Rule of Civil Procedure 56 because as a matter of law 1) Plaintiffs cannot establish injury, causation, materiality or reliance, 2) BodyArmor's products comply with FDA regulations, 3) Plaintiffs claims are preempted and 4) Plaintiffs claims are barred by the First Amendment.

This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities in support of the Motion, the Declaration of Matthew Borden, the Declaration of Lee Soffer, and the files and records in this action and any further evidence and argument that the Court may consider.

Dated: May 7, 2021

Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP

By: ___/s/ Matthew Borden___
Matthew Borden

*Attorney for Defendant*
*BA Sports Nutrition, LLC*

MOT. FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND................................................................................................. 3

    A.    The Parties ................................................................................................. 3

    B.    The Complaint ........................................................................................... 3

    C.    The Court's Order Dismissing the Original Complaint ......................................... 4

    D.    The First Amended Complaint and Order Denying BodyArmor's Second Motion to Dismiss.......................................................................... 5

    E.    Plaintiffs' Depositions............................................................................... 5

ARGUMENT ......................................................................................................................... 6

I.    PLAINTIFFS CANNOT ESTABLISH INJURY, CAUSATION, OR MATERIALITY ............................................................................................. 6

    A.    Plaintiffs Have Admitted that They Were Not Misled by Fruit Imagery..................................................................................................... 7

        1.    Plaintiff Silver Gave an Inaccurate Account that Fruit Images Caused Him to Buy the Product.................................................... 7

        2.    Plaintiffs Admitted that They Read the Nutrition Facts and Ingredients and Thus Could Not Have Been Misled about How Much Sugar the Products Contained or Whether They Contained Fruit.................................................................... 9

        3.    Both Plaintiffs Testified that They Did Not Want Fruit Juice ................ 11

        4.    No Sports Beverages Contain Fruit Juice ................................................. 12

    B.    Plaintiffs Have Admitted that They Were Not Misled by the Term "Superior Hydration" .......................................................................... 12

    C.    Plaintiff Hill Did Not Rely on Any Off-Label Advertisements ........................... 14

    D.    Because Plaintiffs Were Not Misled by the Fruit Images or the Term "Superior Hydration," the Court Should Grant Summary Judgment for the Same Reasons It Granted BodyArmor's First Motion to Dismiss .................................................................................................. 15

II.    PLAINTIFFS' CLAIMS ARE PREEMPTED............................................................... 18

III.    PLAINTIFFS' CLAIMS ARE BARRED BY THE FIRST AMENDMENT.................. 21

    A.    Plaintiffs' Regulation Does Not Survive *Central Hudson* .................................. 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

B.     Plaintiffs' Regulation Does Not Survive NIFLA/Zauderer ................................. 23

    1.     Plaintiffs' Regulation Is an Unconstitutional Content-Based
           Restriction on Speech ............................................................................ 23

    2.     Plaintiffs' Regulation Does Not Fall under Either Exception
           to *NIFLA* ............................................................................................. 24

CONCLUSION.................................................................................................................... 25

MOT. FOR SUMMARY JUDGMENT

## TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Ackerman v. Coca-Cola Co.*,
  2010 WL 2925955 (E.D.N.Y. July 21, 2010).................................................18, 19, 20

*Ass'n v. San Francisco*,
  916 F.3d 749 (9th Cir. 2019) ....................................................................21, 22, 25

*Barr v. American Association of Political Consultants, Inc.*,
  140 S. Ct. 2335 (July 6, 2020) ................................................................. 22, 23

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................ 6

*Central Hudson Gas & Electric Corporation v. Public Service Commission*,
  447 U.S. 557 (1980) ................................................................................ 22

*Chacanaca v. Quaker Oats Co.*,
  752 F. Supp. 2d., 1111 (N.D. Cal. 2010)................................................... 21

*Clark v. Perfect Bar, LLC*,
  816 F. App'x 141 (9th Cir. 2020) .........................................................18, 20, 21

*Clark v. Perfect Bar, LLC*,
  2018 WL 7048788 (N.D. Cal. Dec. 21, 2018)...........................................2, 4, 11, 15

*Cook, Perkiss, & Liehe v. N. Cal.  Collection Serv., Inc.*,
  911 F.2d 242 (9th Cir. 1990) ................................................................... 13

*Durell v. Sharp Healthcare*,
  183 Cal. App. 4th 1350 (2010) ............................................................... 6

*Guttmann v. Nissin Foods (U.S.A.) Co., Inc.*,
  2015 WL 4881073 (N.D. Cal. Aug. 14, 2015) ........................................... 10

*Hawkins v. Kroger Co.*,
  906 F.3d 763 (9th Cir. 2018) ................................................................... 21

In *CTIA-The Wireless Association v. Berkeley*,
  928 F.3d 832 (9th Cir. 2019) ................................................................. 21, 24

*In re Tobacco II* Cases,
  46 Cal. 4th 298 (2009)............................................................................. 6

*Kane v. Chobani, Inc.*,
  973 F. Supp. 2d 1120 (N.D. Cal. 2014)..................................................... 6

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ................................................................. 13

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................ 6

*National Institute of Family and Life Advocates v. Becerra*,
  138 S. Ct.  (2018) ...............................................................................21, 23, 24, 25

*Nat'l Council for Improved Health v. Shalala*,
  122 F.3d 878 (10th Cir. 1997) ................................................................. 18

*Orlander v. Staples*,
  802 F.3d 289 (2d Cir. 2015) ................................................................... 6

Police Dept. v. Mosley,
  408 U.S. 92 (1972) ................................................................................ 23

*Pom Wonderful, LLC v. Coca-Cola Co.*,
  679 F.3d 1170 (9th Cir. 2012) ................................................................. 6
*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015) ........................................................................... 23
*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ............................................................................... 22
*Truxel v. General Mills Sales, Inc.*
  2019 WL 3940956 (N.D. Cal. Aug. 13, 2019) ............................... passim
*United States v. Caronia*,
  703 F.3d 149 (2d Cir. 2012) ................................................................... 22
*Univ. of Fla. Research Found., Inc. v. Orthovita, Inc.*,
  1998 WL 34007129 (N.D. Fla. Apr. 20, 1998) ...................................... 13
*Wilson v. Frito-Lay N. Am., Inc.*,
  260 F.Supp.3d 1202 (N.D. Cal. 2017) .................................................... 11
*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985) ............................................................................... 21

Statutes

21 U.S.C. § 343 ........................................................................................ 18
21 U.S.C. § 343(r)(l) ................................................................................ 18
21 U.S.C. § 343-1(a)(5) ........................................................................... 21
21 U.S.C. § 393 ........................................................................................ 18
Cal. Bus. & Prof. Code §§ 17200 ............................................................. 6
Cal. Civ. Code §§ 1750 .............................................................................. 6
New York General Business Law ("GBL") §§ 349 and 350 ..................... 6

Rules

Fed. R. Civ. P. 56(a) ................................................................................... 6
Federal Rule of Civil Procedure 56 ............................................................ i

Regulations

21 C.F.R. § 101 ........................................................................................ 18
21 C.F.R. § 101.13(b)(1) .......................................................................... 19
21 C.F.R. § 101.14(a)(1) .......................................................................... 19
21 C.F.R. § 101.14(a)(4) .......................................................................... 19
21 C.F.R. §§ 101.54(e)(1), 101.65(d)(2) ................................................... 4
58 Fed.Reg. 2478 (Jan. 6, 1993) ............................................................. 19
81 Fed. Reg. 33742-01 (May 27, 2016) ............................................. 20, 22

Defendant BA Sports Nutrition, LLC ("BodyArmor") respectfully submits this memorandum in support of its Motion for Summary Judgment.

**INTRODUCTION**

BodyArmor makes sports beverages packed with electrolytes and vitamins. Unlike its main competitors, BodyArmor contains potassium to prevent muscle cramping, is made with coconut water and has no artificial flavors or colors.

Four named Plaintiffs filed this lawsuit claiming that the language "superior hydration" on BodyArmor's labels misled them into believing that the products contain less sugar than was accurately stated in the Nutrition Facts. After the Court dismissed their claims, Plaintiffs added allegations claiming that the images of fruit on BodyArmor's labels were now what misled them. They further asserted that because scientific studies purport to measure hydration, Plaintiffs "understood [the labels] to mean that BodyArmor's capacity for superior hydration was objective and variable in degree and/or measure." (FAC ¶ 65.) In light of these allegations, the Court allowed the case to proceed.

Discovery has now shown that no Plaintiff can state a claim. Two of the four named Plaintiffs dismissed their claims altogether,[1] and the other two admitted them away. Plaintiff Alexander Hill testified that he did not rely on any scientific studies in purchasing the product, that he understood that "hydration is not a measurable factor," that he read the Ingredients and Nutrition Facts before buying BodyArmor, and that he did not rely on any of the off-label marketing cited in the First Amended Complaint ("FAC").

One day after Mr. Hill testified, Plaintiffs obstructed the deposition of their final named plaintiff, Marc Silver, so as to prevent him from doing the same. After the Court imposed sanctions and ordered Plaintiff Silver to appear for a second deposition (Dkt. No. 98.), Plaintiff Silver offered testimony identical to Plaintiff Hill's. He conceded that he read the Nutrition Facts and the Ingredients and kept buying the product, did not want fruit juice, and that he believed that hydration is not capable of measurement.

---

[1] Plaintiff Donovan Marshall dismissed his claims on April 7, 2020. (Dkt. No. 25.) Plaintiff Heather Peffer dismissed her claims on November 13, 2020. (Dkt. No. 83.)

1    To establish their claims, as well as their right to proceed in federal court, Plaintiffs must

2  prove – at a bare, constitutional minimum – injury and causation.  They cannot do so.  They were

3  not injured or misled; they bought the product knowing what was in it.

4    Equally importantly, in *Clark v. Perfect Bar, LLC*, the Honorable William Alsup rejected

5  Plaintiffs' tactic of claiming that various statements misled them into thinking that a protein bar

6  was "healthy" when it contained more sugar than their lawyers said a protein bar should have.

7  2018 WL 7048788, at *1 (N.D. Cal. Dec. 21, 2018). Judge Alsup held that plaintiffs could simply

8  look at the Nutrition Facts to "decide for themselves how healthy or not the sugar content would

9  be," that they could not have "reasonably overestimate[d] the health benefits of the bar merely

10  because the packaging elsewhere refers to it as a health bar," *id.*, and that because "the honey/sugar

11  content was properly disclosed — that is the end of it — period." *Id.* Similarly, in *Truxel v.*

12  *General Mills Sales, Inc.*, the Honorable Jeffrey S. White rejected plaintiffs' contention that sugar

13  in breakfast cereals rendered health and wellness claims misleading where the label "plainly

14  discloses the sugar content."  2019 WL 3940956, at *4 (N.D. Cal. Aug. 13, 2019).

15    In this case, this Court held the same thing: "A reasonable consumer purchasing a sports

16  drink (in such flavors as Fruit Punch, Berry Blast, Tropical Fruit and Grape) would not be misled

17  into thinking that simply because the label states that it provides 'Superior Hydration' and contains

18  vitamins and electrolytes, that this necessarily means anything about the overall health benefits of

19  the product given the disclosure of the sugar content." (Dkt. 40 at 15.) The only reason this Court

20  allowed Plaintiffs' claims to proceed was their new theory that they were misled by the fruit images

21  and the supposed objective meaning of "superior hydration."  Plaintiffs, however, admitted that

22  they read the Nutrition Facts and Ingredients, so they were not misled about the sugar content or

23  whether there was actual fruit in the products (which they testified they did not want, anyway), and

24  they did not believe "superior hydration" was some type of objective claim.  Because discovery has

25  shown that the legal premises for allowing the claims to proceed do not exist, there is no legal

26  ground to continue this case.

27    Plaintiffs' testimony underscores why claims like theirs have no place in the federal courts.

28  They cannot be supported by the people who actually buy and enjoy the products.  Nor is there any

limiting principle.  Under Plaintiffs' theory, they could sue an orange juice company for putting a picture of a child playing frisbee on the label because the product would be suggesting it was healthy – when orange juice contains more sugar per serving than BodyArmor.  The same could be done for any other ingredient.  Such health claims and nutrient content claims are regulated by the U.S. Food & Drug Administration ("FDA"), which has considered, and rejected, Plaintiffs' argument that beverage companies should not be allowed to claim that products containing sugar are healthy. Thus, even if BodyArmor expressly claimed to be healthy, which it does not do, such claims separately would be preempted by federal law – which is the precise ground on which the Ninth Circuit affirmed Judge Alsup in *Perfect Bar*.

Plaintiffs' claims are independently barred by the First Amendment.  BodyArmor is the best sports beverage on the planet.  It is allowed to say that its product is great and contains electrolytes and vitamins – all of which is admittedly true.  As this Court found in granting BodyArmor's first motion to dismiss, BodyArmor is also allowed to use the phrase "superior hydration," which is puffery incapable of measurement, like "tastes great, less filling," and hundreds of other iconic ads.

There is no disputed material fact for a jury to resolve. For each of these separate and independent reasons, summary judgment should be entered in favor of BodyArmor.

## FACTUAL BACKGROUND

### A.    The Parties

BodyArmor makes sports drinks enjoyed by a wide variety of leading professional athletes. Unlike competing sports drinks, BodyArmor's products are made with coconut water, natural flavors, and a proprietary blend of electrolytes and vitamins.

Named Plaintiffs Donovan Marshall, Heather Peffer, Alexander Hill and Marc Silver claimed to have purchased BodyArmor at some time in the past.  They were solicited to file this lawsuit through a website called topclassactions.com.  (*E.g*., Dkt. 94 at 143-151.)

### B.    The Complaint

Plaintiffs filed this action on January 28, 2020. The original Complaint alleged that BodyArmor's products were improperly labeled in three ways.  First, Plaintiffs asserted that the marketing slogan "superior hydration" on the label misled them into buying the product. (Compl.

[Dkt. 1] ¶¶ 22, 47).  Second, the complaint asserted that BodyArmor committed a technical

violation of 21 C.F.R. §§ 101.54(e)(1), 101.65(d)(2).  (Compl. ¶¶ 87-89.)  Third, Plaintiffs alleged

that they bought the products because the labels misled them into believing they were healthy,

when in fact they contained too much sugar.  (Compl. ¶¶ 11-16.)

### C.    The Court's Order Dismissing the Original Complaint

On March 23, 2020, BodyArmor moved to dismiss the case under Rule 12(b)(6). (Dkt. 20.)

On June 4, 2020, the Court granted BodyArmor's motion with leave to amend. (Dkt. 40.)

First, regarding Plaintiffs' claims about "superior hydration," the Court held:

> The Court finds it implausible that a reasonable consumer would view
> the BodyArmor label and other marketing about "superior," "more" or
> "better" and believe that BA was making a specific, verifiable claim
> about BodyArmor's superior hydrating attributes.

(Dkt. 40 at 9-10.)

Second, the Court held that Plaintiffs' technical labeling claim under 21 C.F.R. §§

101.54(e)(1), 101.65(d)(2) failed as a matter of law because BodyArmor's labels do not use any of

the terms listed in the regulations that would cause those regulations to apply.  (*Id.*at 16-17.)

Third, the Court rejected Plaintiffs' sugar theory.  Relying on Judge Alsup's decision in

*Perfect Bar*, 2018 WL 7048788, and Judge White's opinion in *General Mills*, 2019 WL 3940956,

the Court found Plaintiffs' claim "implausible" because "it requires that a reasonable consumer

ignore the prominently displayed Nutrition Facts disclosing the total amount of sugar, as well as the

ingredient list stating that 'pure cane sugar' is the second ingredient." (Dkt. 40 at 15.) The Court

further found that:

> A reasonable consumer purchasing a sports drink (in such flavors as
> Fruit Punch, Berry Blast, Tropical Fruit and Grape) would not be
> misled into thinking that simply because the label states that it provides
> "Superior Hydration" and contains vitamins and electrolytes, that this
> necessarily means anything about the overall health benefits of the
> product given the disclosure of the sugar content.

(*Id.*)

Finally, as to Plaintiffs' claims relating to advertisements that were not on the labels of the

product, the Court held that if Plaintiffs wanted to state a claim based on off-label advertising,

"plaintiffs must be able to allege that they saw and relied on those specific advertisements to their detriment."  (Dkt. 40 at 17-18.)

### D.     The First Amended Complaint and Order Denying BodyArmor's Second Motion to Dismiss

On July 7, 2020, Plaintiffs filed the FAC. The FAC added a new claim that the pictures of fruit on the product labels caused Plaintiffs to believe that the products were made from fruit juice and that this caused them to buy the products.  (FAC ¶¶ 17, 26.) It added further allegations claiming that Plaintiffs understood the term "superior hydration" to be an objective statement, capable of verification. (FAC ¶¶ 51-55, 65.)

In a section entitled "Non-Label Deceptive Advertising Claims (Plaintiff Hill)," Plaintiff Hill further alleged that in-store displays, billboards, television ads, Twitter and other social media detailed in Paragraphs 96-100 and Images J-Q of the FAC, separately misled him into buying BodyArmor.  The FAC specifically alleged that Plaintiff Hill understood these non-label ads "to mean that capacity for superior hydration was objective and variable and that BodyArmor was superior." (FAC ¶ 100.)

In reliance on Plaintiffs' new allegations, the Court denied BodyArmor's motion to dismiss the FAC.  (Dkt. 55 at 1-2.) The Court relied on the fact that the FAC "contains new allegations about the fruit-based labeling of the sports drink … and alleges that the plaintiffs 'believed that BodyArmor drinks contained significant amounts of such fruits.'" (Dkt. 55 at 1.) It further stated: "The FAC also expands on previous allegations that plaintiffs were misled by the labeling to believe that the sports drinks provided health benefits because the labeling stated, inter alia, the drinks contained various vitamins and provided 'superior hydration.'" (*Id.*)

### E.     Plaintiffs' Depositions

BodyArmor first noticed Plaintiffs' depositions on September 25, 2020.  (Declaration of Matthew Borden ("Borden Decl.") ¶ 2.) After Plaintiffs refused to cooperate with scheduling their depositions, BodyArmor was eventually able to take the deposition of Plaintiff Hill on December 7. (*Id.*, Ex. 1 ("Hill Dep.")  The next day, Plaintiffs obstructed Plaintiff Silver's deposition.  (*Id.*, Ex. 2 ("Silver I").)  After the Court ordered Plaintiff Silver to reappear (Dkt. No. 98), he refused to do so.

(Dkt. 103.) After BodyArmor moved to enforce the Court's Order, Plaintiff Silver agreed to appear and offered similar testimony to Plaintiff Hill during his second deposition.  (Borden Decl., Ex. 3 ("Silver II").)  Their testimony is detailed in Section I below.[2]

## ARGUMENT

Summary judgment is proper when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law".  Fed. R. Civ. P. 56(a).  The moving party need only demonstrate that there is an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the non-moving party to set out "specific facts showing a genuine issue for trial." *Id.* at 324.

## I.     PLAINTIFFS CANNOT ESTABLISH INJURY, CAUSATION, OR MATERIALITY

Each of Plaintiffs' claims, as well as Article III, requires them to prove injury and causation.[3]  *E.g.*, *Pom Wonderful, LLC v. Coca-Cola Co.*, 679 F.3d 1170, 1178 (9th Cir. 2012), *overruled on other grounds* in 573 U.S. 102 (plaintiff seeking to sue under UCL must show he or she "has suffered injury in fact and has lost money or property as a result of" alleged violation); *Kane v. Chobani, Inc.*, 973 F. Supp. 2d 1120, 1129 (N.D. Cal. 2014), *vacated on other grounds*, 645 Fed. Appx. 593 (9th Cir. 2016) (FAL and CLRA require allegations of reliance on misleading statement and economic injury); *In re Tobacco II* Cases, 46 Cal. 4th 298, 326 (2009) (plaintiff "proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements" and "must show that the misrepresentation was an immediate cause of the injury-producing conduct"); *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367 (2010) (dismissing CLRA claim where plaintiff failed to allege facts showing he "relied on any representation by" defendant); *Orlander v. Staples*, 802 F.3d 289, 300 (2d Cir. 2015) (to state claim under GBL §§ 349 or 350, plaintiff must allege materially misleading conduct caused plaintiff injury); *Lujan v. Defenders of Wildlife*, 504 U.S.

---

[2] Since the depositions, Plaintiffs have continued to engage in vitriolic conduct, while trying to drive up costs in hopes of making this litigation unbearable. (*Id.,* Exs. 4-5.)

[3] Plaintiffs purport to assert claims under the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and False Advertising Law ("FAL"), *id.* §§ 17500, *et seq.*; under New York General Business Law ("GBL") §§ 349 and 350, *et seq.*  Plaintiffs also assert a claim for "unjust enrichment."

555, 560-61 (1992) (Article III standing requires plaintiff to show injury-in-fact that is: (1) concrete and particularized, as well as actual or imminent; (2) fairly traceable to the challenged action of defendant; and (3) likely to be redressed by favorable ruling from court.)

Plaintiffs cannot meet these requirements because they have admitted that they were not misled by the fruit images, sugar content, term "superior hydration" or any off-label advertising.

### A.  Plaintiffs Have Admitted that They Were Not Misled by Fruit Imagery

Neither Plaintiff was misled about the ingredients of BodyArmor because of any fruit imagery on the label or otherwise.  During their depositions, Plaintiffs gave inaccurate testimony about their reliance on fruit images, admitted that they read the Ingredients (which do not include fruit juice), conceded that they had read the Nutrition Facts, which correctly state the amount of sugar in the drinks. They also admitted that neither of them want to drink fruit juice. In these circumstances, they cannot show injury, causation, materiality, or reliance.

#### 1.  Plaintiff Silver Gave an Inaccurate Account that Fruit Images Caused Him to Buy the Product

Plaintiff Silver testified that "fruit images" caused him to buy BodyArmor, but this story unraveled at his second deposition. At his first deposition, Plaintiff Silver testified that a display in the Plumas Stop N Shop with "fruit all over it" enticed him into making his first purchase of Body Armor. (Silver I at 30:8-11.)  But at his second deposition, Plaintiff Silver identified Image K in the FAC – which contains no fruit images – as materially identical to the display in the Stop N Shop that caused him to try BodyArmor.  He testified as follows:

> Q. And I'm looking at now image K over here on the left, and it's a free-standing cardboard display but it appears to have some bottles in it. And is that different than the display that you saw or is it similar?
>
> A.  It's very similar.
>
> Q.  Okay.  So it says "Switch to Body Armor sports drink." is that -- so this is -- I think we found the one that you -- that you saw.  Is there anything different about this one than the one that you saw?
>
> A.  I don't know that there was beverages on the one that I saw.  I still believe that it was just a flat faced advertisement.
>
> Q.  Okay.
>
> A.  We're talking about 2014, so –

1    Q.   Totally understood.  But other than the fact that it has bottles on
2    it, this comports with your memory as very similar in, you know, all
     the important ways as to what you saw in the Stop N Shop.  Is that
     fair?

3    A.   Yes.

4   (Silver II at 244:7:245:7.)

5        But comparing the display he identified in his second deposition to his testimony in his first

6   deposition, his foundational (and heavily obstructed) story about how he came to buy the product is

7   inaccurate because there is no "fruit all over the paper box" that supposedly caught his attention:

8   
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Q Was there any display next to it or associated with it that you looked --

MS. KATS: Object.

Q -- at?

MS. KATS: I'm sorry. Objection.

THE WITNESS: Yes.

BY MR. BORDEN:

Q What was the display?

MS. KATS: Objection.

THE WITNESS: It was a paper board display and that's what caught my attention.

BY MR. BORDEN:

Q What was on the display?

MS. KATS: I'm sorry. I'm going to ask you to let me lodge my objection.

THE WITNESS: Okay. Is this one of those ones that I have to answer or?

MS. KATS: If you can. If you remember.

THE WITNESS: **Okay. Yes. I remember seeing the fruit all over the paper box, and I remember seeing the superior hydration is what caught my eye**.

1   (Silver I at 29:15-30:11 [emphasis added].)

2   As seen in Image K, the display Plaintiff Silver saw had neither "fruit all over the paper

3   box," nor "superior hydration."  His story about being misled by fruit images was not accurate.

4   **2.    Plaintiffs Admitted that They Read the Nutrition Facts and Ingredients and Thus Could Not Have Been Misled about How Much Sugar the Products Contained or Whether They Contained Fruit**

5

6   Equally fundamentally, both Plaintiff Silver and Plaintiff Hill admitted to reading the

7   Nutrition Facts and Ingredients, and therefore could not have been misled about the nutritional

8   content of the product or whether it contained fruit juice. Not only did Plaintiffs read the Nutrition

9   Facts and Ingredients, both of them believed that sugar was bad for them and consumed the product

10   anyway. This vitiates any claim that they were misled about the content or "health" of the product.

11   Plaintiff Hill testified that he read the Ingredients and Nutrition Facts before buying the product.

12   (Hill Dep. at 32:19-34:9.)  In specific, he "definitely" read the sugar content – before going on to

13   buy the product for six years. (*Id.*) He also read the Ingredients, and nothing stood out to him. (*Id.*

14   at 37:17-38:24 ["Q. When you read the ingredients in 2012, is there anything that stood out in your

15   memory about the ingredients? [objection] A. No. Nothing that I can recall stands out."].) Like

16   Plaintiff Hill, Plaintiff Silver admitted that he continued to buy BodyArmor after reading the

17   Nutrition Facts and learning exactly how much sugar it contained. (Silver II at 175:23-176:9.) He

18   also admitted that his practice of reading labels changed at the time he began reading the Nutrition

19   Facts, and that at this same time, he also always read the Ingredients of the foods and beverages he

20   consumed. (Silver II at 180:3-182:6; 247:21-250:12.)

21   Plaintiff Silver also admitted that – like everyone – he wanted sugar in his sports drink:

22   Q Sure. The question is: When you first bought Bodyarmor in 2014, you understood that the product had sugar in it, right?

23   MS. KATS: Objection.

24   THE WITNESS: Yes.

25   BY MR. BORDEN:

26   Q And -- and part of what you want in a sports drink is sugar because it replaces the -- the energy that you are losing when you're working out?

27

28   MS. KATS: Okay. Objection.

THE WITNESS: Yes.

(Silver I at 100:21-102:4.)

And neither Plaintiff believed that sugar was healthy. For example, Plaintiff Hill testified that he believed, since high school, that Gatorade was unhealthy because it was "sugar water." (Hill Dep. at 16:4-17:5.) He further testified that he continued to buy Gatorade and Powerade during the time he was drinking BodyArmor.  (*Id.* at 17.) Plaintiff Silver similarly testified that he had long believed that sugar was not healthy for him:

> Q What made you decide to cut the sugar out of your -- out of your diet? [Objection]
>
> THE WITNESS: For health reasons. Just it's -- I wanted to be healthier. I had children on the way. I want to live as long as I can for my kids.
>
> Q Did you learn more about the effects of sugar at some point that made you want to cut it out, or was -- was it just the fact that you were having kids and that you wanted to be healthy in there for them? [Objection]
>
> THE WITNESS: No. I have always known about sugar.

(Silver I at 46:18-47:10.)

In light of Plaintiffs' testimony that they read the ingredients of the product and bought it anyway, Plaintiffs were not misled. They knew how much sugar it contained because that is stated in the Nutrition Facts. And they knew it did not have fruit in it because fruit is not listed in the Ingredients.  (Dkt. 20-2 at 2.) Nor can Plaintiffs claim that they were misled about the "healthiness" of the product because they were aware of the sugar content, and even believed that consuming sugar was not healthy.  Since they kept drinking BodyArmor (and in Plaintiff Hill's case Gatorade and Powerade), the sugar content of BodyArmor cannot have been material to their purchasing decision or how much they were willing to pay. Where, as here, a plaintiff is not misled by a labeling claim, he cannot state a claim and lacks Article III standing because he was not injured. *See Guttmann v. Nissin Foods (U.S.A.) Co., Inc.*, 2015 WL 4881073, at *2 (N.D. Cal. Aug. 14, 2015) (dismissing claim under 12(b)(1) where plaintiff knew product ingredients); *General Mills*, 2019 WL 3940956, at *1, 4 (N.D. Cal. Aug. 13, 2019) (plaintiffs could not state a claim where "the actual ingredients were fully disclosed and it was up to the Plaintiffs, as reasonable consumers, to

come to their own conclusions about whether or not the sugar content was healthy for them.");
*Perfect Bar*, 2018 WL 7048788, at *1 (N.D. Cal. Dec. 21, 2018) ("Reasonable purchasers could decide for themselves how healthy or not the sugar content would be. No consumer, on notice of the actual ingredients described on the packaging including honey and sugar, could reasonably overestimate the health benefits of the bar merely because the packaging elsewhere refers to it as a health bar...."); *Wilson v. Frito-Lay N. Am., Inc.*, 260 F. Supp. 3d 1202, 1212-1215 (N.D. Cal. 2017) (granting summary judgment based on plaintiff's deposition testimony that he did not rely on the challenged label statements when making his purchasing decision.)

### 3.   Both Plaintiffs Testified that They Did Not Want Fruit Juice

In addition to knowing the product did *not* contain "significant amounts of fruits" (Order Denying Second Motion to Dismiss, Dkt. 55 at 1), both Plaintiffs testified that they did not even want fruit juice in their sports beverages.  Contrary to the FAC's representation that "Plaintiffs allege that they have favorable view of fruits and fruit juices as important to their diet, and healthy. They believed that BodyArmor contained such fruit or fruit products in material amounts given the claims and imagery when it contained none." (Dkt. 48 at 24 (citing FAC)), Plaintiff Silver testified that he did not associate fruit juice with healthiness:

> Q.  Is it truthful to say that you view fruit juices as important to a
> healthy diet?
>
> A.  Oh.
>
> MS. KATS: Objection.
>
> THE WITNESS: I can't really answer that. I haven't really considered
> it, but, no.

(Silver I at 89:1-6.) Plaintiff Silver then testified that he does not drink fruit juice:

> Q Did -- did you ever drink fruit juice?
>
> A Yes, as a child. At some point, growing up. I don't drink fruit juice
> now.
>
> Q Why don't you drink fruit juice?
>
> A Because I prefer water. I drink lots of water.

(Silver I at 90:20-25.). He further testified that fruit juices "have too much sugar." (*Id.* at 91:7.) Plaintiff Silver continued to testify that he in fact tried to avoid drinking fruit juice:

Q. And my question is: Do you try to avoid fruit juice for any reason?

A. Yes.

(*Id.* at 96:18- 20.) His lawyer then shut down further inquiry on the topic. (*Id.*at 96:18-97:25.)

Plaintiff Hill similarly testified that he understood that fruit juices are high in sugar and that he does not drink fruit juice because they cause problems for him.  (Hill Dep. 59:2-16 ["Q. Do you drink any fruit juices? A. No. They tend to cause acid reflux problems for me, so not really."].)

Plaintiffs' testimony that they did not want fruit juice is thus a separate reason that they were not injured by any fruit images, and such images did not cause them to purchase BodyArmor.

### 4.  Sports Beverages Are Not Commonly Expected to Contain Fruit Juice

Finally, while it was outside the scope of the pleadings such that the Court could not consider it at the motion-to-dismiss stage, it is undisputed that no sports beverages contained fruit juice at the time Plaintiffs were buying BodyArmor, and any that now have it, expressly advertise this as a selling point because of its novelty. (Declaration of Lee Soffer ¶ 2-3.)  Neither Plaintiff could identify any other sports drink that contained fruit.  (Silver II 271:16-18).  And Plaintiff Silver had never even heard of the sports drink now on the market that advertises that it does contain actual juice.  (*Id.* at 272:15-273:23.) Thus, Plaintiffs have no fact to support their contention that sports drinks are "commonly expected" to contain fruit juice. (Dkt. 48 at 21.) This is a fourth reason all their claims fail, and a separate and independent reason why their technical labeling claim about "characterizing flavor" fails. 21 C.F.R. § 101.22(i)(1)(i) (rule only applies "if the food is one that is commonly expected to contain a characterizing food ingredient").

*      *      *

In sum, Plaintiffs cannot prove any of the core elements of their claims and of Article III standing:  injury, causation, materiality and reliance. They read the Nutrition Facts and Ingredients and, knowing BodyArmor's contents and nutritional attributes, purchased it anyway.

### B.  Plaintiffs Have Admitted that They Were Not Misled by the Term "Superior Hydration"

Plaintiffs' claims that they were somehow misled by the term "Superior Hydration" also do not hold water.  Both Plaintiffs testified that hydration is not quantifiable such that they could be

1    misled and did not believe the language "superior hydration" to be material. In any event, they got

2    whatever benefits they may have been seeking from consuming BodyArmor.

3    First, contrary to the FAC's allegation that Plaintiffs understood BodyArmor's ads "to mean

4    that superior hydration was objective and variable" (FAC ¶ 100), Plaintiff Hill testified that "[m]y

5    understanding of hydration is not a measurable quality" (Hill Dep at 72:10-11) and that "hydration

6    is not a measurable factor."  (*Id.* at 75:9.) Plaintiff Silver similarly testified that he did not "know

7    how to quantify hydration." (Silver II at 168:6.) He further admitted that he did not understand the

8    language "superior hydration" to be an objectively verifiable claim.

> Q: What did you understand Bodyarmor to be claiming that it was
> superior to? [objection]

9

10   A: That I cannot tell you because I don't know the answer."

11   (Silver I at 115:25-116:5.)

12   Further, although he was extremely health conscious, well educated and sometimes cycled

13   for exercise for three to four hours at a time, Plaintiff Hill did not read or rely on any of the studies

14   that claim to measure hydration cited in the FAC. (Hill Dep. 72:22-74:4, 80:9-81:13.) Neither did

15   Plaintiff Silver.[4] Because neither Plaintiff believed that hydration was capable of measurement,

16   such a claim was non-actionable puffery that could not legally harm Plaintiffs. (Dkt. 40 at 10:4-6

17   ["The Court finds it implausible that a reasonable consumer would view the BodyArmor label and

18   other marketing about 'superior,' 'more' or 'better' and believe that BA was making a specific,

19   verifiable claim about BodyArmor's superior hydrating attributes."].); *Lloyd v. CVB Fin. Corp.*,

20   811 F.3d 1200, 1206-07 (9th Cir. 2016) (affirming Rule 12(b)(6) dismissal of claim that "'CVB's

21   credit metrics are superior' to those of its peers"); *Cook, Perkiss, & Liehe v. N. Cal.  Collection

22   Serv., Inc*., 911 F.2d 242, 246 (9th Cir. 1990) (statement that lamps were "far brighter than any

23   lamp ever before offered for home movies" was puffery); *Univ. of Fla. Research Found., Inc. v.

24   Orthovita, Inc*., 1998 WL 34007129 *27 (N.D. Fla. Apr. 20, 1998) ("unless a claim that a product

25   is 'better' than a competitor's is 'backed-up' with false allegations that 'tests prove' superiority

26

27   [4] (Silver I at 108:25-110:8 ["Q. Now, have you read any articles on hydration? A. No. Q. Have you read any scientific peer-reviewed studies on hydration? A. No. … Q. So it's fair to say that you didn't rely on any articles or studies when you decided to purchase BodyArmor, correct? … A. No, I did not rely on any studies."].)

28

1  when no such tests or only unreliable tests exist to support such a claim, the superiority claim

2  constitutes no more than unactionable puffery."); *see also* Dkt. 32 at 4-6.

3      Separately, discovery also showed that the term was immaterial to Plaintiffs. Plaintiff Silver

4  did not remember that the language was on the label when asked to describe the label. (Silver II at

5  247:17-248:16.) He further testified that whether hydration was objectively measurable "wasn't

6  even a thought" when he purchased BodyArmor. (*Id*. at 168:14-169:1 ["Q. I'm asking back when

7  you were purchasing BodyArmor, did you share Mr. Hill's understanding that hydration is not a

8  measurable quality? A. In 2014 we're speaking now? Q. Correct. A. That wasn't even a thought. I

9  was buying a beverage in a store that appealed to me."].) Plaintiff Hill likewise was unsure whether

10 "superior hydration" was even on the label of the first product he bought. (Hill Dep. at 119:8-16.)

11     Finally, Plaintiffs admitted that BodyArmor delivered the amount of hydration they wanted:

12         Q How do you measure if a product is hydrating or not?

13         MS. KATS: Objection.

14         THE WITNESS: I couldn't tell you but the way that a beverage
           makes me feel is how I judge it.

15         BY MR. BORDEN: Q And when you weren't drinking Bodyarmor,
16         did you ever feel like you didn't get sufficient hydration from the
           product?

17         MS. KATS: Objection.

18         THE WITNESS: No.

19 (Silver I at 107:15-25; Hill Dep. at 109:11-18 ["Q. Now, during the period that you were

20 purchasing Body Armor, do you feel like you got less hydration than what you bargained for?"

21 [objection] A. I don't know how to – I don't know of a way to quantify hydration. So I can't state

22 yes or no."].)  Plaintiff Silver further explained that BodyArmor delivered all the benefits he was

23 looking for in a sports drink. (Silver I at 59:1-60:7; Silver II at 155:14-156:2; 174:7-10.)

24     In sum, the term "superior hydration" did not cause any injury to Plaintiffs.

25 **C.     Plaintiff Hill Did Not Rely on Any Off-Label Advertisements**

26 Contrary to the allegations in the FAC that he relied on non-label ads to his detriment, Plaintiff Hill

27 was unable to identify any non-label advertisements that he relied on to his purported detriment.

28 Plaintiff Hill admitted he never saw any of the YouTube or television ads cited in the FAC as

1  having deceived him into purchasing BodyArmor's products.  (*Id.* at 25:25-26:13.)  He further

2  testified that he did not rely on any of the athlete endorsements identified in the FAC.  (*Id.* at

3  26:14-20.)  He admitted that he had not relied on any of the social media content cited in the FAC.

4  (*Id.* at 26:21-27:7.)  And he testified that he could not remember any specific in-store displays or

5  what they said. (Hill Dep. at 27:8-21 ["Q. What did the ad say? A. I do not recall specific things

6  that were written in ads from five years ago."].)

7          In granting BodyArmor's initial motion to dismiss, the Court expressly directed that "[i]f

8  plaintiffs wish to proceed on deceptive or misleading advertising claims (or related unfair or

9  deceptive business acts claims) based on non-label marketing and advertising, plaintiffs must be

10  able to allege that they saw and relied on those specific advertisements to their detriment."  (Dkt.

11  40 at 17-18.) Plaintiff Hill is the only Plaintiff who the FAC alleges relied on off-label marketing

12  materials. (FAC ¶¶ 95-102.) In light of Plaintiff Hill's testimony, there is no factual dispute that the

13  FAC's allegations about off-label marketing are inaccurate, and Plaintiff Hill did not see or rely on

14  any of this advertising to his detriment.

15          **D.    Because Plaintiffs Were Not Misled by the Fruit Images or the Term "Superior
                    Hydration," the Court Should Grant Summary Judgment for the Same**
16          **Reasons It Granted BodyArmor's First Motion to Dismiss**

17          In granting BodyArmor's motion to dismiss, this Court found Plaintiffs' claim that they

18  were misled unsound because "it requires that a reasonable consumer ignore the prominently

19  displayed Nutrition Facts disclosing the total amount of sugar, as well as the ingredient list stating

20  that 'pure cane sugar' is the second ingredient." (Dkt. 40 at 15.) This Court's ruling tracked Judge

21  Alsup's decision in *Perfect Bar*, 2018 WL 7048788, and Judge White's opinion in *General Mills*,

22  2019 WL 3940956, both of which held that consumers can judge the healthiness of a product

23  containing sugar by reading the Nutrition Facts or Ingredients. Judge Alsup held:

24                  Plaintiffs' grievance is that the packaging led them to believe that the
                    bars would be 'healthy' when, in supposed point of fact, the added
25                  sugar rendered them unhealthy or, in the alternative, less healthy
                    from what they otherwise had believed. This is untenable. The actual
26                  ingredients were fully disclosed. Reasonable purchasers could decide
                    for themselves how healthy or not the sugar content would be.
27

28  *Perfect Bar*, 2018 WL 7048788 at *1.

Judge White likewise held in *General Mills*, 2019 WL 3940956 at *4:

> Similarly here the Court finds that Plaintiffs cannot plausibly claim to
> be misled about the sugar content of their cereal purchases because
> Defendant provided them with all truthful and required objective
> facts about its products, on both the side panel of ingredients and the
> front of the products' labeling. Here too, the actual ingredients were
> fully disclosed and it was up to the Plaintiffs, as reasonable
> consumers, to come to their own conclusions about whether or not
> the sugar content was healthy for them.

Following *Perfect Bar* and *General Mills*, this Court, too, found:

> A reasonable consumer purchasing a sports drink (in such flavors as
> Fruit Punch, Berry Blast, Tropical Fruit and Grape) would not be
> misled into thinking that simply because the label states that it provides
> "Superior Hydration" and contains vitamins and electrolytes, that this
> necessarily means anything about the overall health benefits of the
> product given the disclosure of the sugar content.

(Dkt. 40 at 15.)

In ruling on BodyArmor's second motion to dismiss, this Court held that Plaintiffs' claimed reliance on the possible objective meaning of "superior hydration" and on the fruit images could render Plaintiffs' claims plausible at the pleading stage. (Dkt. 55 at 2.) But discovery, now, has debunked these elements of Plaintiffs' claims, and this case now falls squarely within *Perfect Bar*, *General Mills*, and this Court's Order Granting BodyArmor's Motion to Dismiss.

As to the term "superior hydration," both Plaintiffs testified that they thought that hydration was not quantifiable. (Hill Dep. at 72:10-11 ["My understanding of hydration is not a measurable quality"], 75:9 ["hydration is not a measurable factor"]; Silver II at 168:9-169:1.) Thus, contrary to the allegations in the FAC that Plaintiffs believed superior hydration referred to "verifiable, objective, measurable superiority" (Dkt. 57 at 17:13), Plaintiffs offered testimony that tracked the precise reason why this Court dismissed their "superior hydration" claim as puffery: "The Court finds it implausible that a reasonable consumer would view the BodyArmor label and other marketing about 'superior,' 'more' or 'better' and believe that BA was making a specific, verifiable claim about BodyArmor's superior hydrating attributes." (Dkt. 40 at 10:4-6.)

Further, both Plaintiffs testified that they did not read or rely on any of the studies Plaintiffs added in the FAC (none of which appear on the label), which claim to measure hydration. (Silver I

at 108:25-110:8 ["Q. Now, have you read any articles on hydration? A. No. Q. Have you read any scientific peer-reviewed studies on hydration? A. No. … Q. So it's fair to say that you didn't rely on any articles or studies when you decided to purchase BodyArmor, correct? … A. No, I did not rely on any studies."]; Hill Dep. at 80:9-81:13.)

Finally, Plaintiffs also admitted that this language was immaterial to them. Plaintiff Silver did not remember that the language was on the label (Silver II at 247:17-248:16) and further testified that whether hydration was objectively measurable "wasn't even a thought" when he purchased BodyArmor. (Silver II at 168:14-169:1.) Plaintiff Hill similarly admitted that he was unsure whether "superior hydration" was even on the label of the first product he bought. (Hill Dep. at 119:8-16.)

In sum, all of Plaintiffs' efforts to distinguish this Court's Order Granting BodyArmor's Motion to Dismiss their "superior hydration" claims did not pan out in discovery. Accordingly, the language "superior hydration" does not provide any basis for avoiding this Court's prior Order dismissing their sugar claims. If anything, this vague phrase is far less meaningful than the "health" and "nutrition" oriented language at issue in *Perfect Bar* and *General Mills*.

As to the fruit images, both Plaintiffs admitted that they read the ingredients and that they knew the product contained sugar, that they believed sugar was not good for them, that they bought the product anyway and that they did not drink or care to drink fruit juice. (Section I.A., *supra*.) Leaving aside that this testimony negates injury, causation, reliance and materiality, it also means that the fruit images do not provide any basis for distinguishing this case from the Court's Order Granting BodyArmor's Motion to Dismiss, *Perfect Bar* or *General Mills*. Like the plaintiffs in *Perfect Bar* and *General Mills*, nothing stopped Plaintiffs from reading the Ingredients and Nutrition Facts. To the contrary, Plaintiffs actually did so.

In sum, the FAC's allegations that the Court relied on in denying BodyArmor's second motion to dismiss have proven inapplicable in discovery. Plaintiffs' claims are thus identical to the ones the Court has already found to be legally untenable. This is a separate and independent reason why summary judgment should be granted.

## II.     PLAINTIFFS' CLAIMS ARE PREEMPTED

Plaintiffs' claims fail for the separate and independent reason that they are preempted by federal law. The FDA has considered, and rejected, adopting any rule limiting nutrient content and health claims related to sugar.  Plaintiffs claim that the phrase "superior hydration" and depictions of fruit on BodyArmor's labels are misleading because BodyArmor contains a certain amount of sugar is an attempt to impose additional nutrient content and health claims.  (Hill Dep. at 61-62.) Because they conflict with federal law and FDA regulations, they are preempted.  The Food, Drug, and Cosmetics Act (21 U.S.C. § 343 *et seq.* "FDCA") grants the FDA broad authority over food labeling and empowers it to develop regulations governing the labeling of food. 21 U.S.C. § 393. Pursuant to this authority, the FDA regulates all aspects of food labeling, including ingredients, nutrition information, health claims, and nutrient content claims. 21 C.F.R. §§ 101 *et seq.*

In 1990, Congress passed the Nutritional Labeling and Education Act (NLEA), which amended the FDCA by "expand[ing] the coverage of nutrition labeling requirements," "chang[ing] the form and substance of ingredient labeling on packages," "impos[ing] limitations on health claims," and "standardizing the definitions of all nutrient content claims." *Ackerman v. Coca-Cola Co.*, 2010 WL 2925955 *3 (E.D.N.Y. July 21, 2010); *Clark v. Perfect Bar, LLC*, 816 F. App'x 141, 143 (9th Cir. 2020) ("The NLEA amended the FDCA to establish uniform food labeling requirements" (internal quotation marks omitted)); *Nat'l Council for Improved Health v. Shalala*, 122 F.3d 878, 880 (10th Cir. 1997) (quoting H.R. Rep. No. 101-538 at 7 (1990)) ("The NLEA was passed to 'clarify and strengthen FDA's authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about the nutrients in foods.'").

The NLEA contains an express preemption provision, which "preempts all state law claims that indirectly establish any requirement for the labeling of food that is not identical to the federal requirements." *Perfect Bar*, 816 F. App'x at 143 (internal quotation marks omitted).  Specifically, the NLEA preempts any state law imposing nonidentical requirements regarding "claims in the labeling of food that 'expressly or by implication,' 'characterize[] the level of any nutrient' or 'characterize[] the relationship of any nutrient … to a disease or health related condition.'" *Ackerman*, 2010 WL 2925955 *3 (quoting 21 U.S.C. § 343(r)(l)).

"An expressed nutrient content claim is any direct statement about the level (or range) of a nutrient in the food, e.g., 'low sodium' or 'contains 100 calories.'" 21 C.F.R. § 101.13(b)(1). Plaintiffs claim that the statements "superior hydration" and depictions of fruit are misleading because they purportedly state the "level … of the nutrient in the food product," *id.*, is an attempt to impose a new nutrient content claim rule.

"Health claim means any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication … characterizes the relationship of any substance to a disease or health-related condition." 21 C.F.R. § 101.14(a)(1). Plaintiffs' claim that the phrase "superior hydration" and depictions of fruit on BodyArmor's labels mislead consumers about the health benefits of sports drinks is also an attempt to impose a new health claim rule.

The FDCA authorizes "disqualifying" levels for certain nutrients. If a product contains more than a certain amount of such nutrient, the product cannot make nutrient claims or health claims. *Ackerman*, 2010 WL 2925955, at *8. The FDA has expressly rejected limiting such claims based on sugar content. As one court explained:

> In 1993 the FDA issued a final rule regulating the nutrients that could be considered "disqualifying" for health-claim purposes, and identified only four such nutrients: total fat, saturated fat, cholesterol, or sodium. See 58 Fed.Reg. 2478, 2491 (Jan. 6, 1993); 21 C.F.R. § 101.14(a)(4) (defining "disqualifying nutrient levels" as "the levels of total fat, saturated fat, cholesterol, or sodium in a food above which the food will be disqualified from making a health claim.").
>
> The FDA received several comments during the notice and comment period proposing that sugar be included as a disqualifying nutrient. See 58 Fed. Reg. at 2491. However, it rejected these comments, determining that it "would not be appropriate to limit health claims on foods on the basis of added sugars" because there was "no sound basis" for doing so. *Id.* In particular, the FDA based its conclusion on the fact that "the public health community has not identified a dietary level above which consumption of sugars has been demonstrated to increase the risk of a disease," and the fact that no recommended Daily Reference Value for sugar had been established. *Id.*

*Ackerman*, 2010 WL 2925955, at *8.

In May 2016, the FDA revisited the idea of regulating claims related to sugar. It "received nearly 300,000 comments, conducted several consumer studies and made those studies publicly

available." 81 Fed. Reg. 33742-01 (May 27, 2016) at 33,744.  In its Final Rule, the FDA explained, "We decline to set a DRV [daily recommended value] for sugars or to require the declaration of a percent DV for sugars.  We are not aware of data or information related to a quantitative intake recommendation for sugars that we could use as the basis for a DRV for total sugars."  *Id.* at 33,798.  The FDA further noted that "[s]everal comments suggested that we require various warning statements on the label related to added sugars to warn consumers of the negative health effects of added sugars." *Id.* at 33,829. In rejecting this proposal, it explained: "We decline to revise the rule as suggested by the comments.  The statements are not consistent with our review of the evidence (see our response to comments 136 and 137), and we do not require warning labels or disclaimers for other nutrients on the label. Furthermore, some added sugars can be included as part of a healthy dietary pattern." *Id.*

Through state law, Plaintiffs are attempting to impose a similar – albeit much broader and vaguer – health and nutrient claim rules to the ones the FDA has rejected.  But "[a]s a matter of federal law … the presence of sugar is not a disqualifying nutrient which would prohibit the defendants from 'touting the purported benefits' of the other ingredients in their [product], whether through health claims or express or implied claims of nutrient content." *Ackerman*, 2010 WL 2925955, at *8 (citation omitted).

For precisely this reason, the Ninth Circuit in *Clark v. Perfect Bar*, 816 F. App'x 141 (2020), recently held that claims identical to those brought by Plaintiffs are preempted by the NLEA.  Plaintiffs in that case asserted that, *inter alia*, language that the company's founders' father was a "health food pioneer" misled them into believing the accused protein bars were "healthy," when they in fact contained more sugar than Plaintiffs believed should be in a protein bar.  *Id.* at 142.  These claims were attempts to impose additional health or nutrient content claim rules and thus preempted by the NLEA, as the Ninth Circuit explained:

> To the extent Appellants' claims advance the notion that Perfect Bar made an improper health claim due to added sugar levels in the bar, those claims are not viable….
>
> [U]nder the NLEA, no state may directly or indirectly establish any requirement for the labeling of food that is not identical to the federal requirements. Allowing a claim of misbranding under California law

> based on misleading sugar level content would indirectly establish a
> sugar labeling requirement that is not identical to the federal
> requirements, a result foreclosed by our precedent.

*Id.* at 143 (citing *Hawkins v. Kroger Co.*, 906 F.3d 763, 769 (9th Cir. 2018)) (internal quotation marks and citations omitted); *see also Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d. 1111, 1122–23 (N.D. Cal 2010) (Koh, J.) (rejecting attempt "to ascribe disqualifying status to trans fats where the [FDA] has at least so far declined to do so" and holding that claims were preempted).

Because Plaintiffs' theory attempts to treat sugar as a disqualifying ingredient, it would impose labeling requirements that are not identical to those imposed by applicable federal law. Plaintiffs' claims are therefore preempted. 21 U.S.C. § 343-1(a)(5).

## III.   PLAINTIFFS' CLAIMS ARE BARRED BY THE FIRST AMENDMENT

In its Order denying BodyArmor's second motion to dismiss, the Court stated that it was "not persuaded by defendant's arguments based on the First Amendment." (Dkt. 55 at 2.) But in light of Plaintiffs' testimony above and the record of the FDA's stated government disinterest in regulating sugar-related claims, which the Court now may consider on summary judgment, the First Amendment provides another separate and independent reason Plaintiffs' claims are barred. There is no governmental interest in preventing BodyArmor from making truthful statements on its labels or compelling it to disclose Plaintiffs' lawyers' health theories.  Nor is Plaintiffs' regulation in any way tailored to achieving such interest, and Plaintiffs testified that they had no idea what level of sugar would be appropriate in sports drinks bearing the phrase "superior hydration," (Hill Dep. at 55:9-62:12; Silver I at 101:19-103:11), and allowing such a nebulous claim to proceed would only result in a substantial suppression of protected speech.

In *CTIA-The Wireless Association v. Berkeley*, 928 F.3d 832 (9th Cir. 2019), the Ninth Circuit stated that *Central Hudson* scrutiny applies "in commercial speech cases where the government acts to restrict or prohibit speech," and that the standard in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), as refined by *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2461 (2018) ("NIFLA"), applies to regulations that compel speech.  *See also Am. Bev. Ass'n v. San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc). NIFLA's command that content-based regulations are subject to strict scrutiny even in the

1  commercial speech context was recently affirmed by the Supreme Court in *Barr v. American*

2  *Association of Political Consultants, Inc.*, 140 S. Ct. 2335 (July 6, 2020) (invalidating provision of

3  Telephone Consumer Protection Act that allowed robocalls to collect government-backed debt but

4  not private debt as an unconstitutional content-based restriction on speech) ("*AAPC*").

5       Plaintiffs' complaint seeks to both punish BodyArmor for its speech and to compel a

6  "corrective advertising campaign." (Compl. ¶¶ 122, 132.)  Regardless of which standard is applied,

7  Plaintiffs' claims cannot withstand scrutiny.

8       **A.**   **Plaintiffs' Regulation Does Not Survive *Central Hudson***

9       To the extent *Central Hudson Gas & Electric Corporation v. Public Service Commission*,

10  447 U.S. 557 (1980), applies, Plaintiffs' claims fail.  Under *Central Hudson*, "the government may

11  restrict or prohibit commercial speech that is neither misleading nor connected to unlawful activity,

12  as long as the governmental interest in regulating the speech is substantial.  The restriction or

13  prohibition must directly advance the governmental interest asserted, and must not be more

14  extensive than is necessary to serve that interest."  *Am. Bev.*, 916 F.3d at 755 (citations and

15  quotations omitted).

16       Plaintiffs' proposed regulation does not serve any substantial government interest.  After

17  years of study and analyzing over 300,000 submissions, the FDA, which is responsible for

18  regulating food advertising, rejected establishing a daily recommended value for sugar.  81 Fed.

19  Reg. 33,798.  It also rejected a proposal that products with added sugar carry a warning asserting

20  they are "linked to obesity, Type II Diabetes, [and other health risks]" because it believes that such

21  a statement is "not consistent with [its] review of the evidence" and because "some added sugars

22  can be included as part of a healthy dietary pattern."  Id. at 33,829.  Because the FDA has

23  considered, and rejected, regulating "health claims" based on sugar content, and because

24  BodyArmor's labels truthfully disclose all ingredients, Plaintiffs' cannot meet their burden of

25  showing a substantial government interest.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571-72

26  (2011); *see also United States v. Caronia*, 703 F.3d 149, 166-67 (2d Cir. 2012) (proscribing off-

27  label drug use did not directly advance a substantial governmental interest because off-label use is

28  "generally lawful" and the promotion was entirely true).

Nor is Plaintiffs' proposed regulation tailored to achieve any interest beyond litigation. Plaintiffs' regulation has no limits.  It would allow anyone to sue BodyArmor on any theory of what a "healthy" sports drink should, or should not, have based on any daisy-chain of inferences. Could BodyArmor truthfully state it contains electrolytes without fear of suit for implying the product is "healthy?"  Could BodyArmor truthfully explain how it is made with coconut water without someone inferring that coconuts are "healthy"?  Could BodyArmor put an image of someone playing a sport on the label of its sports drink?  Plaintiffs' amorphous rule would chill truthful speech and is the definition of overbreadth.

### B.    Plaintiffs' Regulation Does Not Survive NIFLA/Zauderer

To the extent *AAPC/NIFLA/Zauderer* applies, Plaintiffs' regulation fails because it is a content-based restriction that does not qualify for anything less than strict scrutiny.

#### 1.    Plaintiffs' Regulation Is an Unconstitutional Content-Based Restriction on Speech

Regulations that "target speech based on its communicative content … are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *NIFLA*, 138 S. Ct. at 2371 (citing *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015)) (quotation omitted).  "This stringent standard reflects the fundamental principle that governments have "'no power to restrict expression because of its message, its idea, its subject matter, or its content.'"  *NIFLA*, 138 S. Ct. at 2371 (quoting *Reed*, 135 S. Ct. at 2226 (quoting Police Dept. v. Mosley, 408 U.S. 92, 95 (1972))); *AAPC*, 140 S. Ct. at 2347 ("a law that is content-based" is "subject to strict scrutiny.") (internal quotation omitted).

In *NIFLA*, the Court held that a law mandating that private crisis pregnancy centers operated by groups opposed to abortion disclose the availability of state-sponsored services, including abortion, was content-based because it altered the content of the speech.  *NIFLA*, 138 S. Ct. at 2371 ("By requiring petitioners to inform women how they can obtain state-subsidized abortions – at the same time petitioners try to dissuade women from choosing that option – the licensed notice plainly alters the content of petitioners' speech." (quotation omitted)).  Similarly here, Plaintiffs seek to hold BodyArmor liable because its labels implied to them that BodyArmor

1    contains a "healthy" amount of sugar, when in their view, it does not.  This claim is based purely

2    on the (supposed) content of BodyArmor's advertising.

3            Since Plaintiffs' regulation is content-based, it must survive strict scrutiny.  *Id.*  It cannot,

4    for the reasons stated above.

5                    **2.      Plaintiffs' Regulation Does Not Fall under Either Exception to *NIFLA***

6            In *NIFLA*, the Court rejected the idea that content-based restrictions on "professional" or

7    "commercial" speech are generally subject to a lower level of scrutiny.  The Court confirmed its

8    reluctance to "mark off new categories of speech for diminished constitutional protection" or to

9    "exempt a category of speech from the normal prohibition on content-based restrictions."  138 S.

10   Ct. 2372 (citations and quotations omitted); see also id. ("This Court's precedents do not permit

11   governments to impose content-based restrictions on speech without persuasive evidence of a long

12   (if heretofore unrecognized) tradition to that effect." (citations and quotations omitted)).

13           The Court acknowledged just two instances where commercial speech may be afforded less

14   protection:  "laws that require professionals to disclose factual, noncontroversial information;" and

15   regulations of "professional conduct, even though that conduct incidentally involves speech."  *Id.*

16   (collecting cases).  The second exception does not apply here because Plaintiffs are not claiming

17   BodyArmor engaged in some sort of professional malpractice.

18           The first exception is also inapplicable because Plaintiffs do not only seek to compel

19   BodyArmor to disclose purely factual, noncontroversial information.  As noted above, there is

20   excessive scientific debate, and no consensus, about sugar.

21           The Ninth Circuit recently examined this aspect of *NIFLA* in the context of an ordinance

22   mandating a disclosure about radio-frequency ("RF") radiation emitted from cellphones.  In *CTIA*,

23   the Court of Appeals concluded that a compelled disclosure which was "literally true," referenced

24   the applicable federal regulations, and used language identical to the federal regulations, was

25   subject to more deferential review.  928 F.3d at 847-48.  For the reasons above, nothing is "literally

26   true" about the disclosures Plaintiffs would impose.

27           Indeed, nutrition guidance is constantly evolving and often disputed.  See, e.g., R. Primack,

28   *Researchers Now Have a Much More Nuanced Understanding of Whether We Should Eat Pasta,*

WASH. POST (July 6, 2016), available at

https://www.washingtonpost.com/news/wonk/wp/2016/07/06/researchers-nowhave-a-much-more-

nuanced-understanding-of-whether-we-should-eat-pasta/.  Just as with pasta, fat, salt, wine, coffee,

and countless other nutrients and foods, the FDA and scientists continue to debate the impact of

consuming sugar and how much sugar one should consume.  What makes food healthy, including

its sugar content, is "anything but an 'uncontroversial' topic."  *NIFLA*, 138 S. Ct. at 2372.

Accordingly, as in *NIFLA*, "*Zauderer* has no application here."  *Id.*

Finally, even if *Zauderer* did apply, Plaintiffs' claims would still fail because they are not

reasonably related to a substantial governmental interest, as *Zauderer* requires.  *See Am. Bev.*, 916

F.3d at 755 ("Under *Zauderer*, the government may compel truthful disclosures in commercial

speech as long as the compelled disclosure is reasonably related to a substantial governmental

interest." (internal citations and quotations omitted).  Plaintiffs offer no evidence or facts to support

their theory that foods with a certain quantity of added sugar is unhealthy.  Nor do they provide any

reason to believe consumers lack sufficient information to evaluate the healthiness of BodyArmor

drinks given all the truthful disclosures on the product packaging.

In sum, the First Amendment is an additional separate and independent ground for granting

summary judgment on all of Plaintiffs' claims.

## CONCLUSION

For the foregoing reasons, BodyArmor's motion should be granted.


Dated:  May 7, 2021                          Respectfully Submitted,

                                             BRAUNHAGEY & BORDEN LLP


                                             By:   */s/ Matthew Borden*
                                                   Matthew Borden

                                             *Attorney for Defendant*
                                             *BA Sports Nutrition, LLC*