# EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| MARC SILVER and ALEXANDER    ) | |
| HILL,                         ) | |

MARC SILVER and ALEXANDER      )

HILL,                          )

                               )

            Plaintiffs,        )

                               )

     vs.                       )     Case No. 20-CV-00633-SI

                               )

BA SPORTS NUTRITION, et al.,  )    Volume II

                               )       Pages 131 - 297

            Defendants.        )

                               )


COMPLETELY VIDEO

DEPOSITION OF MARC SILVER

CALIFORNIA

FRIDAY, APRIL 16, 2021


Reported by:

LAURA A. RUTHERFORD, RPR

CSR No. 9266



Page 155

1    coming out at about $150.

2              Does that sound right to you?

3         A.   Sounds about right.

4         Q.   And in terms of -- did you ever ask Body

5    Armor for a full refund of your purchases?

6         A.   No.

7         Q.   Did you ever try to contact anybody from the

8    company and say, "You know, I'm dissatisfied with the

9    product that I bought.  Can I have my money back, please?"

10        A.   No.

11        Q.   And you're not even seeking a full refund in

12   this litigation; correct?

13        A.   No.

14        Q.   And no, I'm not correct, or no, you're not

15   seeking a full refund?

16        A.   No, I'm not seeking a full refund.

17        Q.   Because you got some enjoyment out of the

18   product when you were buying it; right?

19        A.   I wasn't really drinking it for enjoyment.  I

20   was drinking it for a hydration source when I was

21   exercising.  Flavor-wise, I guess maybe I enjoyed it.

22        Q.   And you got hydration out of it too; right?

23        A.   To the best of my knowledge, yes.

24        Q.   You're not saying in this case that Body

25   Armor somehow failed to hydrate you; right?



Page 156

```
 1                    That's not part of your claim?
 2          A.    No.
 3          Q.    I'm correct that that's not part of your
 4   claim; right?
 5          A.    You're breaking up again.
 6          Q.    Sorry.  And I'm sorry if it's a little bit
 7   repetitious, just for the purpose of getting clear
 8   questions and answers.
 9                But in this case, you're not claiming that
10   Body Armor failed to hydrate you; correct?
11          A.    That's correct, but I am claiming that they
12   may not have superiorly hydrated me.
13          Q.    So I understood that Body Armor offered you a
14   thousand dollars, and that far exceeds the amount of any
15   financial money that you could be entitled to in this
16   case; right?
17          A.    Yes.
18          Q.    Now, you understand that your recovery in
19   this case can't exceed the recovery to any other class
20   member, potential class member; right?
21          A.    To the best of my knowledge, yes.
22          Q.    Did anyone talk to you about an incentive
23   award or incentive fee?
24                MR. KING:  I think you're getting into
25   privileged areas, Matt.  So if that's the question, I
```



MAGNA
LEGAL SERVICES

Page 168

```
1              A.    Yes.

2              Q.    Now, back when you bought Body Armor for the

3    first time, did you share a similar understanding to

4    Mr. Hill, that hydration is not a measurable quality?

5              A.    I don't know if I would quite word it like

6    that.  I don't know how to quantify hydration.  But I do

7    know that it was something that I was looking for when I

8    was working out.

9              Q.    Well, my question is slightly different,

10   which is just simply, do you agree with your

11   co-plaintiff's statement that hydration is not a

12   measurable quality?

13              And I'm not really asking in the present

14   either.  I'm asking back when you were purchasing Body

15   Armor, did you share Mr. Hill's understanding that

16   hydration is not a measurable quality?

17              A.    In 2014 we're speaking now?

18              Q.    Correct.

19              A.    That wasn't even a thought.  I was buying a

20   beverage in a store that appealed to me.

21              Q.    Okay.

22              So you -- you didn't disagree with Mr. Hill;

23   correct?

24              A.    For the average, uneducated person, I would

25   agree with it.  If you're a scientist, or something, then
```



Page 169

1   it may be a quantifiable thing.

2           Q.   Okay.

3                So I'm going to show you another document,

4   and this is another -- it's going to be another page from

5   Mr. Hill's deposition.  So let me get that to you.

6                All right.

7                Can you see page 32 from Mr. Hill's

8   deposition on your screen?

9           A.   Yes.

10          Q.   So Exhibit 23, for the record, is going to be

11  pages 32 and 33 from the deposition of Alexander Hill.

12               (Exhibit Number 23 was marked for

13  identification.)

14          Q.   BY MR. BORDEN:  And what I would like to

15  direct you to is beginning on line 19, where you see

16  "Question."

17               Are you with me, Mr. Silver?

18          A.   Yes.

19          Q.   It says,

20               "Question:  Now, when you were buying

21               something in 2012, you would -- like a new

22               product, because you like to try something

23               new, you would look at the label to

24               investigate what was in the product you were

25               buying; right?



Page 174

1          Q.    Did you -- I mean, did you care about the

2   electrolyte content of, you know, the sports beverage you

3   were consuming?

4          A.    Yes, I did.  I didn't look to see what the

5   levels were, or anything.  I just -- it appealed to me,

6   and I grabbed it off the shelf.

7          Q.    When you first purchased Body Armor, were why

8   were you looking for a sports drink?

9          A.    Because I want hydration.  I want something

10  that will be beneficial to me when I exercise.

11         Q.    Did you care about potassium when you first

12  purchased Body Armor?

13         A.    I cared about potassium, but I didn't pay

14  attention as to whether it was in the drink or not.

15               Actually, this is 2014, we're speaking about;

16  correct?

17         Q.    Let's start with 2014.

18         A.    2014?  Yes.  I did care about it, but I

19  didn't bother to read the label.  I gave the label a

20  precursory glance and purchased it.

21         Q.    So over the course of the time that you were

22  purchasing Body Armor, did you care about potassium more

23  or less than when you originally purchased it?

24         A.    I think I've always cared about it the same.

25         Q.    Did you ever look and see how much potassium



Page 175

1   was in the product?

2           A.   I don't remember.

3           Q.   During the entire time that you were

4   purchasing Body Armor, did you ever look to see how many

5   calories were in the product?

6           A.   Yes.

7           Q.   When was that?

8           A.   I believe it was around 2017, 2018.

9           Q.   What makes you, sort of, give that date?

10          A.   I was -- going to become a father, and I

11  needed to start caring about my health and reading labels

12  closer.

13          Q.   I see.

14               And once you read the amount of carbs in it,

15  did you stop drinking it right there and then?

16          A.   Fairly soon after.

17          Q.   So you continued to buy it for some period of

18  time.  But then shortly after that, you stopped; correct?

19          A.   You broke up a little bit on that when you

20  were getting up from your seat.

21          Q.   Oh, sure.  Sorry.  Let me repeat the question

22  for you.

23               So after you read the carbohydrate content on

24  that, for a short period of amount of time, you continued

25  to buy the product.  But then you stopped; is that



Page 176

1  accurate?

2          A.   Yes.

3          Q.   And in terms of that time when you read the

4  carbohydrate content, you were looking at the nutrition

5  facts; correct?

6          A.   The sugars and carbohydrates, and such?

7               Fats?

8          Q.   Yes, exactly.

9          A.   Well, not fat, but -- yes.

10         Q.   Okay.  Let's see.

11              I'm not going to -- are we doing -- are we

12  done with share screen?  Are you looking on my screen

13  right now, or are you looking at me?

14         A.   I'm on full screen.

15         Q.   Okay.

16         A.   So I'm looking at everyone.

17         Q.   Okay.

18         A.   I almost knocked my computer off the desk.

19         Q.   So I'm not going to show you and read you the

20  deposition, but I will represent to you that Mr. Hill

21  testified that he read the ingredients before he bought

22  the product.

23              Did you do the same thing as Mr. Hill and

24  read the ingredients before you first purchased Body

25  Armor?



Page 180

1   in some products are.

2          Q.   For sure.

3               But you understand if you want to know, at

4   least, what is in the product, you can just look at the

5   ingredient part of the label, and it will tell you all the

6   things that are in it; right?

7          A.   Yes.

8          Q.   And you've known that for at least a couple

9   decades; right?

10         A.   That's fair to say.

11         Q.   And I take it you read the ingredients of

12  some foods and beverages that you consume; correct?

13         A.   When are we talking about?

14         Q.   Right now.

15         A.   Right now, I read about everything on the

16  labels, because I'm feeding three children and my wife.

17         Q.   Okay.

18              When did you start reading the ingredients of

19  the foods and beverages that you purchase?

20         A.   2017, 2018.

21         Q.   So before that time, you didn't read the

22  ingredients of any of the foods and beverages that you

23  purchased; correct?

24         A.   I may have read some of them.

25         Q.   And did you have a practice of which foods or



Page 181

1  beverages you would read the ingredients for before you

2  bought them?

3          A.   When are we talking about?

4          Q.   Let me -- you know -- so, I guess, I'm seeing

5  two worlds here.  I'm seeing like a 2017-2018 world, where

6  you become, sort of, more health conscious.  And at that

7  point, you start reading the ingredients of everything;

8  correct?

9          A.   Just about everything, yes.

10          Q.   And do you think it's likely that you read

11  the ingredients of Body Armor at that time, but you just

12  don't remember?

13          A.   It could be.  It's -- it would be hearsay.

14  If I can't remember, I'm only guessing.

15          Q.   I don't want you to guess.  And so if you

16  don't remember, there's fine.

17               I am -- you know, if you did have a habit or

18  a practice of doing something, you know, you could tell me

19  that.

20               And it sounds like your habit or practice

21  was, as you became more health conscious in the 2017-2018,

22  window, you began to look at the ingredients of just about

23  everything, but you don't remember doing it in specific

24  for Body Armor; is that accurate?

25          A.   Correct.  Yes.



Page 182

1          Q.   And before that -- and I don't want to

2    mischaracterize anything you said.  But before this, sort

3    of, awakening in 2017 or 2018, you may have sporadically

4    read the ingredients of foods and beverages that you

5    consumed; correct?

6          A.   Yes.

7          Q.   Was there any kind of habit or pattern to

8    when you would look at the ingredients or when you

9    wouldn't look at the ingredients prior to 2017-2018?

10         A.   Not that I could -- no.

11         Q.   So in addition to Mr. Hill, did you

12   understand that there were two additional plaintiffs in

13   this case who wanted to serve as class representatives?

14         A.   I don't know if that's something that was

15   relayed to me by my lawyer after --

16              MR. KING:  Let me just caution you, Marc, not

17   to get any into communications with your lawyers.  If you

18   can answer the question without referencing communications

19   with your lawyers, please go ahead.

20              THE WITNESS:  No, I can't.

21         Q.   BY MR. BORDEN:  So I'm not -- this was just a

22   factual question.  I'm not asking for any legal advice

23   that you sought or was provided to you.

24              I'm just asking if you knew that there were

25   two additional individuals who, you know, also wanted to



Page 244

```
 1              MR. KING:  The document is there.

 2              MR. BORDEN:  Okay.

 3              Thank you, Counsel.

 4         Q.   BY MR. BORDEN:  Okay.

 5              So let me ask my question again, Mr. Silver,

 6    because it was probably a little bit confusing.

 7              So Exhibit 30 are some images that were

 8    included in your Complaint.  And I'm looking at now image

 9    K over here on the left.  And it's a free-standing

10    cardboard display, but it appears to have some bottles in

11    it.

12              And is that different than the display that

13    you saw, or is it similar?

14         A.   It's very similar.

15         Q.   Okay.

16              So it says "Switch to Body Armor Sports

17    Drink."

18              Is that -- so this is -- I think we found the

19    one that you -- that you saw.

20              Is there anything different about this one

21    than the one that you saw?

22         A.   I don't know that there was beverages on the

23    one that I saw.  I still believe that it was just a flat

24    faced advertisement.

25         Q.   Okay.
```



Page 245

1          A.   We're talking about 2014, so --

2          Q.   Totally understood.

3               But other than the fact that it has bottles

4    on it, this comports with your memory as very similar in,

5    you know, all the important ways as to what you saw in the

6    Stop N Shop.  Is that fair?

7          A.   Yes.

8          Q.   Okay.

9               And just for sake of completeness, image L is

10   not what you saw in the Stop N Shop; correct?

11         A.   No.

12         Q.   And image M and N are also not what you saw

13   in the Stop N Shop; right?

14         A.   No.

15         Q.   When you say, "no," you really mean to say

16   yes, that's not what I saw?

17         A.   That is not what I saw.

18         Q.   Okay.  Thanks.  All right.

19              When is the last time you saw one of Body

20   Armor's labels?

21         A.   One of their labels?

22         Q.   Uh-huh.

23         A.   Sometime in 2018.

24         Q.   So it would be on the last bottle of Body

25   Armor that you purchased?



Page 247

 1               I can just give you a basic description of

 2    the label, and I can't even tell if you that's a memory

 3    from 2014 or from last week.

 4          Q.   Okay.

 5               Well, let me ask you a different question.

 6               Before we get to that, did the label of the

 7    lemon or lemonaid product change during any point in which

 8    you were purchasing it?

 9          A.   It may have.  It may have changed from lemon

10    to lemonaid.  I don't know that.  I think that's why I'm

11    unclear on the lemon or lemonaid.

12          Q.   Okay.

13               So you think it may have changed, but you

14    don't really know one way or another?

15          A.   True.

16          Q.   Okay.

17               Let's try the orange mango then.  Did that

18    label change over the course of the time that you were

19    buying it?

20          A.   Not that I noticed.

21          Q.   Okay.

22               So let's talk about the orange mango label

23    then.  If you were looking at it head on, just like you

24    may be looking at me -- hard to tell with Zoom.

25               But if you're looking at it head on from the



Page 248

1    front, what do you see on the label of orange mango?

2            A.    I see the flavor and pictures of fruit down

3    the side.  And that's about all I can recollect.

4            Q.    So it says, "Orange Mango Flavor," and then

5    it had the fruit down the side, and that's all you can

6    remember?

7            A.    Yeah.

8            Q.    Okay.

9                  And now, did you ever turn the bottle one way

10   or another to see what was on the side of the labels?

11           A.    Yes, I did.  I looked and saw certain vitamin

12   contents in it.  I can't remember which vitamins I saw,

13   but I did read that, and that was part of my purchase of

14   the item.

15           Q.    Anything else?

16           A.    No.

17           Q.    So when you say the "vitamins are part of

18   your purchasing the item," what do you mean by that?

19           A.    Well, vitamins are supposed to be good for

20   you.  And when you're working out, vitamins are essential

21   to you.  So that's what I mean.

22           Q.    So I think what you're saying is, like,

23   before you -- well, I don't know want to put words in your

24   mouth.

25                 Was the vitamin something that you looked up



Page 249

1    before you bought the product, or was it one of these

2    things where, over time, you looked at it, and you noticed

3    that there were vitamins in it?

4              A.    Before I bought the product the first time?

5              Q.    Yes.

6              A.    Before I bought the product the first time, I

7    don't think I even noticed the vitamins.  I believe I just

8    went for whatever flavor I grabbed just sample the

9    product.

10             Q.    I got it.

11                   But over time, over that course of -- you

12   know, between 2014 and 2018, or even in that period of

13   2014 until the time that you became, you know, more

14   conscious about label reading, somewhere in 2017, you did

15   notice that it had vitamins, and that was important to

16   you?

17             A.    Yes.

18             Q.    And that was one of the reasons that you were

19   purchasing the product is because you wanted to vitamins

20   that were in it?

21             A.    Yes.

22             Q.    Okay.

23                   So you had vitamins on one side.  Do you

24   remember what was on the other side?

25                   Is that something you ever looked at?



Page 250

1        A.   I cannot remember what was on the other side.

2        Q.   Okay.

3             Did you ever read the back of the label?

4        A.   At some point, yes, I did.  Not when I first

5   bought it.

6        Q.   Okay.

7             But at some point between 2014, when you

8   first bought it, and 2017, when you became more conscious

9   and more devoted to label reading, did you ever, you know,

10  sort of, turn the thing around and actually look on what

11  was on the back of them?

12       A.   Yes.

13       Q.   But as you sit here, you don't -- you don't

14  really remember what was on it?

15       A.   That's correct.

16       Q.   Who does the shopping in your household?

17       A.   It's a combination.  Usually, my wife, but,

18  occasionally, I do the shopping, and, occasionally, we

19  both do the shopping.

20       Q.   That sounds about right.

21             And I think you told me at the last

22  deposition that you bought bottled water; is that right?

23       A.    I have bought bottled water before, but I

24  don't think I said that I bought bottled water.  I said I

25  drank water.



Page 271

```
 1          Q.    Yeah.

 2                I mean -- go ahead.

 3                Sports beverages don't have fruit in them, do

 4     they?

 5          A.    That, I don't know as a true statement.  I

 6     think -- that there are sports beverages that have coconut

 7     water in them.  I'm not a big -- sports -- I can't say.  I

 8     don't think -- I don't know that that's a true statement.

 9          Q.    But you kind of identified coconut water was

10     having fruit in it.  Is that fair?

11          A.    Yeah.  It's -- coconut's a fruit, isn't it?

12          Q.    Okay.

13          A.    Or nuts?

14                Maybe.  I don't know.  For some reason, I was

15     thinking fruit.

16          Q.    Well, as you is sit here, can you think of

17     any sports beverage that has fruit in it?

18          A.    Off the top of my head, no.

19          Q.    And back when you were -- and I realize that

20     you're sort of out of the sports beverage market for a

21     couple years now, right?

22          A.    (Nods affirmatively.)

23          Q.    But going back to that period when you were

24     purchasing sports beverages, were you aware of any sports

25     beverages in that period which contained fruit in them?
```



Page 272

```
 1              A.    I thought that Body Armor did.

 2              Q.    Let's put Body Armor aside.

 3                    In that period that you were buying sports

 4      drinks, did you know of any sports drink that had fruit in

 5      it, other than, you know, what you thought about Body

 6      Armor?

 7              A.    That's really the only sports drink I bought,

 8      so --

 9              Q.    All right.

10                    I'm going to show you one more document here.

11                    All right.

12                    So you're looking at Exhibit 41.

13                    (Exhibit Number 41 was marked for

14      identification.)

15              Q.    BY MR. BORDEN:  This is a product that's a

16      Gatorade product, and it says, "Juice-based sports drink."

17                    Do you see that?

18              A.    I do.

19              Q.    So -- so this -- this is a sports drink that

20      has juice in it; correct?

21              A.    It would seem like it.  I would think so, if

22      I looked at the label and read that.

23              Q.    Why do you think it has juice in it?

24              A.    It says that it's, "Flavored with a juice

25      blend, with apples, strawberry, blueberry juices, with
```



Page 273

1   other natural flavors."  And it says, "Juice-based sports

2   drink from concentrate."

3            Q.   So when you were purchasing Body Armor in the

4   2014 to 2018 period, was this one of the

5   things -- products that you were relying on to form your

6   belief that Body Armor might, indeed, have fruit in it,

7   because here was another sports drink that also had fruit

8   in it?

9            A.   The bottle was covered with fruit like this,

10  and it said that it was "flavored with natural flavors."

11  So I took that to mean that it had fruit juice in it.

12           Q.   I see.

13                So you found the language "Flavored with

14  natural flavors" to be misleading?

15           A.   Yes.

16           Q.   Okay.

17                But in terms of your belief that Body Armor

18  contained fruit in it, it wasn't in any way based on the

19  fact that you knew of this other sports drink that also

20  had fruit in it?

21                You were totally oblivious of this Gatorade

22  product; correct?

23           A.   I'm never even seen than bottle before.

24           Q.   In fact, is this the only sports drink you've

25  ever seen in your life that had fruit in it?



1

2

3          I, the undersigned, a Certified Shorthand Reporter

4    for the State of California, do hereby certify:

5          That prior foregoing proceedings were taken

6    completely video before me at the time and place herein

7    set forth; that any witnesses in the foregoing

8    proceedings, prior to testifying, were placed under oath;

9          That a verbatim record of the proceedings was made

10   by me using machine shorthand which was thereafter

11   transcribed under my direction; further, that the

12   foregoing is an accurate transcription thereof.

13         I further certify that I am neither financially

14   interested in the action nor a relative or employee of any

15   attorney of any of the parties.

16         IN WITNESS WHEREOF, I have this date subscribed my

17   name.

18

19   Dated:_____

20

21                      _____

                        Laura A. Rutherford, RPR

22                      CSR No. 9266

23

24

25



**Suzanne Powley**

EXHIBIT

**20**

| | |
|---|---|
| **From:** | Cameron Baker <baker@braunhagey.com> |
| **Sent:** | Friday, December 11, 2020 11:59 AM |
| **To:** | Laurence King; Mario M. Choi; Maia Kats; Donnie Hall; mreese@reesellp.com; ggranade@reesellp.com |
| **Cc:** | Matt Borden; David Kwasniewski; Tracy Zinsou; Noah Hagey |
| **Subject:** | Marc Silver et al. v. BA Sports Nutrition, LLC, Case No. 3:20-cv-00633-SI (N.D. Cal.) |
| **Attachments:** | 2020-12-11 - BodyArmor - Rule 68 Offer.pdf; 2020-12-11 - Proof of Service.pdf |

Counsel,

Attached please find documents pertaining to the above-captioned matter.

Regards,

Cameron Baker
**B R A U N H A G E Y & B O R D E N L L P**
Direct: (415) 539-3177

**San Francisco (Main Office)**
351 California Street, 10th Floor
San Francisco, CA 94104
Tel. & Fax: (415) 599-0210

**New York**
7 Times Square
27th Floor
New York, NY 10036-6524
Tel. & Fax: (646) 829-9403

This message is intended only for the confidential use of the intended recipient(s) and may contain protected information that is subject to attorney-client, work product, joint defense and/or other legal privileges. If you are not the intended recipient, please contact me immediately at the phone number listed above and permanently delete the original message and any copies thereof from your email system. Thank you.

1   J. Noah Hagey, Esq. (SBN: 262331)
        hagey@braunhagey.com
2   Matthew Borden, Esq. (SBN: 214323)
        borden@braunhagey.com
3   David H. Kwasniewski, Esq. (SBN: 281985)
        kwasniewski@braunhagey.com
4   Tracy O. Zinsou, Esq. (SBN: 295458)
        zinsou@braunhagey.com
5   BRAUNHAGEY & BORDEN LLP
    351 California Street, Tenth Floor
6   San Francisco, CA 94104
    Telephone:  (415) 599-0210
7   Facsimile:  (415) 276-1808

8   ATTORNEYS FOR DEFENDANT
    BA SPORTS NUTRITION, LLC
9

10                      **UNITED STATES DISTRICT COURT**

11                     **NORTHERN DISTRICT OF CALIFORNIA**

12  MARC SILVER, ALEXANDER HILL,          Case No. 3:20-cv-00633-SI
    individually and on behalf of all others
13  similarly situated,                    **OFFER OF JUDGMENT PURSUANT TO**
                                           **FED. R. CIV P. 68 BY DEFENDANT BA**
14              Plaintiffs,                **SPORTS NUTRITION, LLC**

15          v.

16  BA SPORTS NUTRITION, LLC,

17              Defendant.

18

19

20

21

22

23

24

25

26

27

28

**TO PLAINTIFFS MARC SILVER AND ALEXANDER HILL AND THEIR COUNSEL OF RECORD:**

Pursuant to Federal Rule of Civil Procedure 68, Defendant BA Sports Nutrition, LLC ("BodyArmor"), by and through its undersigned counsel, and reserving all rights, claims and defenses, hereby offers to allow the enclosed [Proposed] Judgment to be entered against it in favor of Plaintiffs Marc Silver and Alexander Hill ("Plaintiffs") as follows:

1. This is an Offer of Judgment to resolve this litigation in its entirety. In the event Plaintiffs fail to accept the Offer of Judgment and ultimately do not prevail on their claims or obtain a judgment that is not more favorable than the within Offer of Judgment, Plaintiffs will be personally responsible for Defendant's costs, and "must pay the costs incurred after the offer was made." Fed. R. Civ. P. 68. Defendant reasonably anticipates that such costs in defending this action through trial will exceed $150,000, including without limitation, expert fees, depositions, forensic analysis, trial costs, witness fees, and other such costs and expenses necessary for full defense of this action.

2. The Offer of Judgment is not an admission of liability or wrongdoing by BodyArmor as to any of the allegations set forth in the operative complaint. To the contrary, BodyArmor expressly denies the claims at issue and maintains that Plaintiffs' claims lack merit. The Judgment represented herein is an effort by BodyArmor solely to avoid the further expense and distraction of litigation.

3. The terms of the Offer of Judgment is as follows: that judgment will be entered against Defendant and in favor of Plaintiffs on each and every one of Plaintiffs' claims, including all of those asserted or which could have been asserted in the operative complaint in the amount of $2,000.00 USD ($1,000 to Mr. Silver and $1,000 to Mr. Hill), inclusive of all actual or potential damages, attorney's fees, costs, interest, penalties, and any other monetary items actually or potentially recoverable by Plaintiffs or their attorneys of record in connection with the claims and statutes at issue in this matter.

4. The Offer Amount exceeds the costs of refunding any alleged purchases about which Plaintiffs supposedly are unhappy. Pursuant to its standard practice, BodyArmor would

OFFER OF JUDGMENT PURSUANT TO RULE 68

have made such refunds had Plaintiffs simply asked for such reimbursement before filing this lawsuit.

5. This Offer of Judgment is expressly conditioned on acceptance by *each* individual named Plaintiff, *i.e.*, it will not be deemed accepted unless each Plaintiff accepts it. The Offer Amount is inclusive of, and represents full compromise and satisfaction of, all Plaintiffs' alleged statutory and common law claims, costs, attorneys' fees, pre- and post-judgment interest, and all other interests, including without limitation, any and all damages (statutory or otherwise), litigation costs, attorneys' fees, penalties or other amounts that Plaintiffs asserted or could have asserted in this action, and any such claim that Plaintiffs or their attorneys may have under applicable law against BodyArmor or any of its current or former corporate parents, subsidiaries, shareholders, attorneys, agents, successors or assigns.

6. **Plaintiffs have fourteen (14) days from service of this Offer of Judgment in which to accept it.**

Please indicate Plaintiffs' acceptance of this offer by executing the statement to that effect set forth below.

Dated: December 11, 2020

BRAUNHAGEY & BORDEN LLP

By: */s/ Matthew Borden*
      Matthew Borden

Attorneys for Defendant BA Sports Nutrition, LLC

OFFER OF JUDGMENT PURSUANT TO RULE 68

# ACCEPTANCE OF RULE 68
# OFFER OF JUDGMENT

Plaintiffs Marc Silver and Alexander Hill, by and through their duly authorized undersigned counsel, having been fully advised and informed regarding the above offer, hereby accept the Offer of Judgment on the terms stated herein pursuant to Rule 68 of the Federal Rules of Civil Procedure.

Dated: _____     By: _____
                                       Attorney for Plaintiff Marc Silver

Dated: _____     By: _____
                                       Attorney for Plaintiff Alexander Hill

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC SILVER, ALEXANDER HILL, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>BA SPORTS NUTRITION, LLC,<br><br>    Defendant. | Case No. 3:20-cv-00633-SI<br><br>**[PROPOSED] JUDGMENT IN A CIVIL CASE PURSUANT TO OFFER OF JUDGMENT** |

**IT IS HEREBY ORDERED AND ADJUDGED:**

Pursuant to the terms of Defendant's Rule 68 Offer, Judgment is hereby entered against Defendant BA Sports Nutrition, LLC ("Defendant") and in favor of Plaintiffs Marc Silver and Alexander Hill ("Plaintiffs") on each and every one of Plaintiffs' claims, including all of those asserted or which could have been asserted in the operative complaint, for the sum total of Two Thousand Dollars USD ($2,000.00) (the "Judgment Amount"), to be divided evenly by Plaintiffs.

The Judgment Amount is inclusive of all Plaintiffs' alleged claims, costs, attorneys' fees, pre- and post-judgment interest, and all other interests, including without limitation, any and all damages (statutory or otherwise), litigation costs, attorneys' fees, penalties or other amounts that Plaintiffs asserted or could have asserted in this action, and any such claim that Plaintiffs or their attorneys may have under applicable law against Defendant or any of its current or former corporate parents, subsidiaries, shareholders, attorneys, agents, successors or assigns.

The Clerk shall close the file.

Date: _____          _____
                              HON. SUSAN ILLSTON
                              United States District Court Judge

[PROPOSED] JUDGMENT

1  J. Noah Hagey, Esq. (SBN: 262331)
      hagey@braunhagey.com
2  Matthew Borden, Esq. (SBN: 214323)
      borden@braunhagey.com
3  David H. Kwasniewski, Esq. (SBN: 281985)
      kwasniewski@braunhagey.com
4  Tracy O. Zinsou, Esq. (SBN: 295458)
      zinsou@braunhagey.com
5  BRAUNHAGEY & BORDEN LLP
   351 California Street, 10th Floor
6  San Francisco, CA 94104
   Telephone: (415) 599-0210
7  Facsimile: (415) 599-0210

8  ATTORNEYS FOR DEFENDANT
   BA SPORTS NUTRITION, LLC
9

10

11              **UNITED STATES DISTRICT COURT**

12              **NORTHERN DISTRICT OF CALIFORNIA**

13

14

15  MARC SILVER, ALEXANDER HILL,          Case No. 3:20-cv-00633-SI
    individually and on behalf of all others similarly
16  situated,                             **PROOF OF SERVICE**

17              Plaintiffs,               **Judge:**    Hon. Susan Illston
                                          **Ctrm.:**    1, 17th Floor
18          v.
                                          Complaint filed: January 28, 2020
19  BA SPORTS NUTRITION, LLC,

20              Defendant.

21

22

23

24

25

26

27

28

                                                       Case No. 3:20-cv-00633-SI

I, Cameron Baker, declare:

I am over the age of 18 years and not a party to the within actions. I hereby declare that on **December 11, 2020**, I served the following document(s) on the parties listed below by transmitting to the parties through their counsel of record in this matter **via U.S. Mail and email** , from my business email address with BraunHagey & Borden LLP, baker@braunhagey.com without any known email error message, bounce-back or other technical defect.

Document(s) served:

1. **OFFER OF JUDGMENT PURSUANT TO FED. R. CIV P. 68 BY DEFENDANT BA SPORTS NUTRITION, LLC**

To counsel of record:

| | |
|---|---|
| **KAPLAN FOX & KILSHEIMER LLP**<br>Laurence D. King (SBN 206423)<br>*lking@kaplanfox.com*<br>Mario M. Choi (SBN 243409)<br>*mchoi@kaplanfox.com*<br>1999 Harrison Street, Suite 1560<br>Oakland, CA 94612 | **KAPLAN FOX & KILSHEIMER LLP**<br>Donald R. Hall (pro hac vice to be sought)<br>*dhall@kaplanfox.com*<br>850 Third Avenue, 14th Floor<br>New York, New York 10022 |
| **KAPLAN FOX & KILSHEIMER LLP**<br>Maia C. Kats (pro hac vice)<br>*mkats@kaplanfox.com*<br>6109 32nd Place, Northwest<br>Washington, DC 20015 | **REESE LLP**<br>Michael R. Reese (SBN 206773)<br>*mreese@reesellp.com*<br>100 West 93rd Street, 16th Floor<br>New York, NY 10025 |
| | **REESE LLP**<br>George V. Granade (SBN 316050)<br>*ggranade@reesellp.com*<br>8484 Wilshire Boulevard, Suite 515<br>Los Angeles, California 90211 |

I certify and declare under penalty of perjury that the foregoing is true and correct.

_____     _____
Cameron Baker

Case No. RG20057491

PROOF OF SERVICE

EXHIBIT

**21**

# Exhibit 7

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Maia Kats (*pro hac vice*)
Mario M. Choi (SBN 243409)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: (415) 772-4700
Facsimile: (415) 772-4707
*lking@kaplanfox.com*
*mchoi@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Donald R. Hall (*pro hac vice*)
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
*dhall@kaplanfox.com*

**REESE LLP**
Michael R. Reese (SBN 206773)
100 West 93rd Street, 16th Floor
New York, NY 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
*mreese@reesellp.com*

**REESE LLP**
George V. Granade (SBN 316050)
8484 Wilshire Boulevard, Suite 515
Los Angeles, CA 90211
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
*ggranade@reesellp.com*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| MARC SILVER and ALEXANDER HILL, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>    vs.<br><br>BA SPORTS NUTRITION, LLC,<br><br>                Defendant. | Case No. 3:20-cv-00633-SI<br><br>**<u>CLASS ACTION</u>**<br><br>**DECLARATION OF MARC SILVER IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SANCTIONS**<br><br>Judge:      Hon. Susan Illston<br>Courtroom:  1, 17th Floor<br>Date:       February 19, 2021<br>Time:       10:00 a.m. |

1       I, Marc Silver, declare as follows:

2       1.      I am a plaintiff in the above-captioned litigation. I submit this Declaration in support

3 of Plaintiffs' Opposition to Defendant's Motion for Sanctions. I have personal knowledge of the

4 facts stated in this Declaration and, if called a witness, I could and would testify competently to

5 them.

6       2.      On December 8, 2020, I appeared via zoom for my deposition in this matter.

7 Counsel for Defendant BA Sports Nutrition, LLC ("Defendant"), Matthew Borden, began

8 questioning me at approximately 10 a.m.

9       3.      Early on in the deposition, I noted out loud that my throat had a strange tickle, and

10 that I was unsure about why this was happening.

11       4.      Over the course of the deposition, I experienced increasing discomfort in my eye,

12 and felt feverish.

13       5.      In terms of the deposition questions by Defendant's counsel, I felt constantly

14 confused, and increasingly so as the deposition went on.

15       6.      I cannot say how much of this was because of Defendant's counsel, and how much

16 of it was because I was not feeling well.

17       7.      However, I can say that I felt that counsel's questions were often ridiculous, and that

18 he was trying to spin a web to catch me, with the whole experience leaving me confused.

19       8.      Defendant's counsel just kept going around and around with the same question,

20 asking it in a different way despite my having answered.

21       9.      He also had a list of ideas as to why I would buy a product that made absolutely no

22 sense to me because they were not a reason for my purchase. I tried to explain this but he did not

23 listen.

24       10.     I answered every question to the best of my ability to answer at the time given my

25 condition.

26       11.     I never failed to answer a question that I could answer to the best of my ability at the

27 time.

28

12. Many times I tried to explain my confusion or ask a question to make sure that I understood his questions, but it did not seem to help.

13. Often times I had the reporter read back a question to see if I might be able to better understand it a second time. But this did not help me much either.

14. The two words which come to my mind to best describe the questioning are confusing and frustrating. As time went on, I felt more and more rattled too.

15. When the deposition ended I immediately took my temperature. It was 101.4 degrees.

16. I then took Tylenol and went to Urgent Care.

17. At Urgent Care, I was given a COVID-19 test and directed to leave immediately and quarantine.

18. I learned the next day that my COVID-19 test was negative, and I was given antibiotics to clear up an infection by the Physician's Assistant.

19. On January 20, 2021, I had a chest x-ray, which was abnormal. I am to have a CT scan soon, as my doctor is concerned that I have pneumonia.

20. In mid-December, my attorneys advised me that Defendant had made an Offer of Judgment stating that if I dropped my claims, Defendant would pay me $1,000. I rejected the offer because, while it was good money for me, it would have meant that the class which I signed up to represent would not be receiving anything and that the labeling would continue in the same way it always has.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 27th day of January, 2021, in Santa Rosa, California.

*/s Marc Silver*
Marc Silver

3. Early on in the deposition, I noted out loud that my throat had a strange tickle, and that I was unsure about why this was happening.

4. Over the course of the deposition, I experienced increasing discomfort in my eye, and felt feverish.

5. In terms of the deposition questions by Defendant's counsel, I felt constantly confused, and increasingly so as the deposition went on.

6. I cannot say how much of this was because of Defendant's counsel, and how much of it was because I was not feeling well.

7. However, I can say that I felt that counsel's questions were often ridiculous, and that he was trying to spin a web to catch me, with the whole experience leaving me confused.

8. Defendant's counsel just kept going around and around with the same question, asking it in a different way despite my having answered.

9. He also had a list of ideas as to why I would buy a product that made absolutely no sense to me because they were not a reason for my purchase. I tried to explain this but he did not listen.

10. I answered every question to the best of my ability to answer at the time given my condition.

11. I never failed to answer a question that I could answer to the best of my ability at the time.

12. Many times I tried to explain my confusion or ask a question to make sure that I understood his questions, but it did not seem to help.

13. Often times I had the reporter read back a question to see if I might be able to better understand it a second time. But this did not help me much either.

14. The two words which come to my mind to best describe the questioning are confusing and frustrating. As time went on, I felt more and more rattled too.

15. When the deposition ended I immediately took my temperature. It was 101.4 degrees.

16. I then took Tylenol and went to Urgent Care.

17. At Urgent Care, I was given a COVID-19 test and directed to leave immediately and quarantine.

18. I learned the next day that my COVID-19 test was negative, and I was given antibiotics to clear up an infection by the Physician's Assistant.

19. On January 20, 2021, I had a chest x-ray, which was abnormal. I am to have a CT scan soon, as my doctor is concerned that I have pneumonia.

20. In mid-December, my attorneys advised me that Defendant had made an Offer of Judgment stating that if I dropped my claims, Defendant would pay me $1,000. I rejected the offer because, while it was good money for me, it would have meant that the class which I signed up to represent would not be receiving anything and that the labeling would continue in the same way it always has.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 27th day of January, 2021, in Santa Rosa, California.

/s Marc Silver

Marc Silver

- 1 -    Case No. 3:20-cv-00633-SI

DECL. OF MARC SILVER PLAINTIFFS' OPP. TO MOT. FOR SANCTIONS

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**EXHIBIT**

**22**

MARC SILVER, HEATHER PEFFER,   )
ALEXANDER HILL, individually   )
and on behalf of all others    )
similarly situated,            )
                               )
           Plaintiffs,         )
                               )
vs.                            ) Case No. 3:20-cv-00633-SI
                               )
BA SPORTS NUTRITION, LLC,      )
                               )
           Defendant.          )
_____)

VIDEO-RECORDED REMOTE DEPOSITION OF ALEXANDER HILL

December 7, 2020

10:07 a.m. - 2:50 p.m.

Reported by: Carrie LaMontagne, CSR No. 13393



Page 72

1          A.    I'm 33.

2          Q.    You look younger, by the way.

3          A.    Thank you.

4          Q.    So do you understand how much hydration a

5     33-year-old man of 175 pounds needs to consume after

6     a, you know, hour on a road bike?

7          A.    So for my --

8                MR. KING:  Object to the form.

9          Go ahead and answer.

10               THE WITNESS:  My understanding of

11    hydration is not a measurable quality at this point.

12    So I don't know how to answer that question.

13    BY MR. BORDEN:

14         Q.    Well, what does hydration mean to you,

15    then, if it's not a measurable quality?

16         A.    I mean, things could be measurable but not

17    definable at the same time.  So I don't think those

18    two are the same.  But hydration is, you know,

19    retaining water and retaining a healthy balance in

20    your body between electrolytes, sugars, salts, and

21    water.

22         Q.    Have you read articles on hydration?

23         A.    A few.  But not regularly or not in depth.

24         Q.    When did you read these articles?

25         A.    I definitely read some as my biking



Page 193

1                    REPORTER'S CERTIFICATE

2              I, Carrie LaMontagne, Certified Shorthand

3    Reporter in and for the State of California, License

4    No. 13393, hereby certify that the deponent,

5    ALEXANDER HILL,  was by me first duly sworn and the

6    foregoing testimony was stenographically reported by

7    me and was thereafter transcribed with

8    Computer-Aided Transcription; that the foregoing is

9    a full, complete, and true record of said

10   proceeding.

11             I further certify that I am not of counsel

12   or attorney for either or any of the parties in the

13   foregoing proceeding and caption named or in any way

14   interested in the outcome of the cause in said

15   caption.

16             The dismantling, unsealing, or unbinding

17   of the original transcript will render the

18   reporter's certificates null and void.

19             In witness whereof, I have hereunto set my

20   hand this day: December 17, 2020.

21        (  ) Reading and Signing was requested.

22        (  ) Reading and Signing was waived.

23        ( X )Reading and Signing was not requested.

24

25                   _____



**EXHIBIT**

**23**

1   knowledge that I have now or mindset that I have

2   now.

3        Q.   In 2012, you were exercising regularly?

4        A.   Yeah.

5        Q.   Five, six times a week?

6        A.   Probably three or four at that point.

7        Q.   And you care about your health?

8        A.   Yeah.

9        Q.   And you care about what you consumed in

10   terms of eating and drinking?

11        A.   Again, as I've aged, I care much more now

12   than I used to.

13        Q.   You cared about it in 2012, though, right?

14        A.   Yeah.  Somewhat.

15        Q.   You wanted to consume good products?

16        A.   I think so.  I mean, my memory's a little

17   sketchy back then, but I definitely made some worse

18   decisions when I was younger.

19        Q.   Now, when you were buying something in

20   2012, you would -- like a new product, because you

21   liked to try something new, you would look at the

22   label to investigate what was in the product you

23   were buying, right?

24        A.   Yes.  I would look for some specific

25   things.



Page 33

1      Q.    What did you look for?

2      A.    I generally looked at, like, either

3   carbohydrates, sugars, fats, the main ones on the

4   back of the label.  I wasn't very knowledgeable

5   about the ingredients if that's what you want to

6   know.

7      Q.    So you would look under the nutrition

8   facts and it has in big, you know, sort of big font,

9   it has the calories, that was something you looked

10  at?

11     A.    I don't know -- I wasn't really worried

12  about caloric content at that point.

13     Q.    Okay.  So but you were worried about fat?

14     A.    It was just something that I tended to

15  look out for.

16     Q.    Okay.  And sugar?

17     A.    Definitely.

18     Q.    And carbohydrates?

19     A.    Yep.

20     Q.    Okay.  But after you -- and did you do

21  that for Body Armor?

22     A.    In the initial stage, yeah.

23     Q.    And when you say in the initial stage, you

24  mean that when you first bought the product you

25  looked at it, but it wasn't like every time you



EXHIBIT
16

# TOP CLASS ACTIONS

## BodyArmor SuperDrink Class Action Investigation

FOLLOW ARTICLE   f FB   🐦 TW   🔗 LI   ✉️   By Top Class Actions
July 23, 2020

## Who's Affected?

Did you purchase BodyArmor SuperDrink?

Sports drinks are big business in the United States. Sports drinks sales are estimated to be around $6.6 billion annually. Nevertheless, substantial concerns have been raised about their efficacy and link to disease.

BA Sports Nutrition ("BA"), the maker of BodyArmor SuperDrink, is one of the largest sports drink retailers in the country. BA reported approximately $400 million in sales for 2018. However, the company may be misleading its customers about the benefits of drinking BodyArmor SuperDrink.

Indeed, BA recently was forced to defend itself against deceptive marketing claims before the complaints division of the Better Business Bureau, called the NAD. The NAD agreed with the complaints and recommended, on multiple occasions, that BA alter BodyArmor marketing by dropping several claims, but BA refuses to do so. Its retail sales doubled in 2018.

If you purchased BodyArmor SuperDrink for yourself or your kids, you may qualify to join this BodyArmor false advertising class action lawsuit investigation.

Learn more by filling out the short form on this page.

### BodyArmor SuperDrink False Advertising Class Action Lawsuit Investigation

Attorneys working with Top Class Actions are investigating whether BA lacks sufficient scientific evidence to back up such claims, which may render their labeling and advertising deceptive and unlawful.

They are also investigating other important matters with respect to their advertising, including the implication that BodyArmor Super Drink is good for your body and health.

If you purchased BodyArmor Super Drink, you may qualify to join this false advertising class action lawsuit investigation.

See if you qualify by filling out the form on this page.

### GET HELP – IT'S FREE

#### Join a Free BodyArmor Class Action Lawsuit Investigation

If you qualify, an attorney will contact you to discuss the details of your potential case at no charge to you.

PLEASE NOTE: If you want to participate in this investigation, it is imperative that you reply to the law firm if they call or email you. Failing to do so may result in you not getting signed up as a client or getting you dropped as a client.

E-mail any problems with this form to: Questions@TopClassActions.com.

First Name *

Last Name *

Street Address *

City *

State *
Alabama

Zip Code *

Phone *

Email *

Are you willing to speak with an attorney about this situation? *
○ Yes
○ No

What is your preferred form of contact with the attorney? *
○ Email
○ Phone

Did you purchase BodyArmor SuperDrink? *
○ Yes
○ No

What drink(s) did you purchase? *

When did you purchase BodyArmor Sports Drink? *

Please include additional details.

¿Necesita un orador español?
○ Sí
○ No

Get Our Newsletter
We tell you about cash you can claim every week! Subscribe to our free newsletter today.
☐ Yes, sign me up!

Any information you submit to Top Class Actions may be shared with attorneys or law firms to facilitate formation of an attorney-client relationship. As such, it is intended that the information will be protected by attorney-client privilege, but it is possible that Top Class Actions or such attorneys may be ordered by a court of law to produce such information in certain legal situations. Also, you are not formally represented by a law firm unless and until a contract of representation is signed by you and the law firm. *
☐ I understand and agree

☐ I'm not a robot   reCAPTCHA

SUBMIT

After you fill out the form, the attorneys who work with Top Class Actions will contact you if you qualify to let you know if an individual lawsuit or class action lawsuit is best for you.

ATTORNEY ADVERTISING

The choice of a lawyer is an important decision and should not be based solely on advertisements.

Counsel responsible for this advertisement:

Kaplan Fox & Kilsheimer LLP

Reese LLP

PAID ATTORNEY ADVERTISEMENT: THIS WEB PAGE IS AN ADVERTISEMENT AND THE PARTICIPATING ATTORNEY(S) ARE INCLUDED BECAUSE THEY PAY AN ADVERTISING FEE. Top Class Actions is not a law firm, lawyer referral service, or prepaid legal services plan. We do not endorse or recommend any third-party claims processing company, lawyer, or law firm who participates in the network. We do not make any representation, and have not made any judgment, as to the qualifications, expertise, or credentials of any participating lawyer or processing group. No representation is made that the quality of the legal services or claims processing to be performed is greater than the quality of legal services or claims processing performed by other lawyers or claims processing group. The information contained herein is not legal advice. Any information you submit to Top Class Actions does not create an attorney-client relationship and might not be protected by attorney-client privilege. Instead, your information will be forwarded to an attorney or claims processing firm for the purpose of a confidential review and potential representation. You should not use this website to submit time-sensitive, or privileged information. All photos contained on this website are of models and do not depict clients.

Top Class Actions is a Proud Member of the American Bar Association

LEGAL INFORMATION IS NOT LEGAL ADVICE

This site provides information about the law and lawsuits and is designed to help users safely cope with their own legal needs. Legal information is NOT the same as legal advice - the application of law to an individual's specific circumstances. Although we go to great lengths to make sure our information is accurate and useful, we recommend you consult a lawyer if you want professional assurance that our information, and your interpretation of it, is appropriate to your particular situation. You should consider all postings or writings at TopClassActions.com by staff or others as personal opinion only and NOT the advice of a lawyer. Top Class Actions Legal Statement

©2008 – 2020 Top Class Actions® LLC

Various Trademarks held by their respective owners

Please note: Top Class Actions is not a settlement administrator or law firm. Top Class Actions is a legal news source that reports on class action lawsuits, class action settlements, drug injury lawsuits and product liability lawsuits. Top Class Actions does not process claims and we cannot advise you on the status of any class action settlement claim. You must contact the settlement administrator or your attorney for any updates regarding your claim status, claim form or questions about when payments are expected to be mailed out.

ATTORNEY ADVERTISING

Edit This Edit with WPBakery Page Builder

**EXHIBIT 25**

# TCA - Investigation - BodyArmor SuperDrink

## Top Class Actions <noreply@topclassactions.com>

Tue 11/26/2019 12:35 PM

To: Maia Kats <MKats@kaplanfox.com>;

Categories: Red category

**Post Title**

BodyArmor SuperDrink Class Action Investigation

**First Name**

Marc

**Last Name**

Silver

**Street Address**

650 Sunny Manor Way

**City**

Santa Rosa

**State**

California

**Zip Code**

95401

**Phone**

(707) 555-1212

**Email**

themarcx@msn.com

**Are you willing to speak with an attorney about this situation?**

Yes

**What is your preferred form of contact with the attorney?**

Email

**Did you purchase BodyArmor SuperDrink?**

Yes

**What drink(s) did you purchase?**

All of them

CONFIDENTIAL

**When did you purchase BodyArmor Sports Drink?**

2013 to 2018

**Please include additional details.**

I drank these on a daily basis. If you need to contact me by phone emailing for my real phone number but I am bothered by too many spam calls every day so I don't give my number out unless it is necessary.

**¿Necesita un orador español?**

No

**Any information you submit to Top Class Actions may be shared with attorneys or law firms to facilitate formation of an attorney-client relationship. As such, it is intended that the information will be protected by attorney-client privilege, but it is possible that Top Class Actions or such attorneys may be ordered by a court of law to produce such information in certain legal situations. Also, you are not formally represented by a law firm unless and until a contract of representation is signed by you and the law firm.**

I understand and agree

PL0002

EXHIBIT
# 26

**Mario M. Choi**

| | |
|---|---|
| **From:** | Marc x Silver <themarcx@msn.com> |
| **Sent:** | Thursday, November 12, 2020 6:41 PM |
| **To:** | Mario M. Choi |
| **Subject:** | Fwd: TCA - Investigation - BodyArmor SuperDrink |

Sent from my iPhone

Begin forwarded message:

> **From:** Maia Kats <MKats@kaplanfox.com>
> **Date:** December 16, 2019 at 2:21:22 PM PST
> **To:** Marc x Silver <themarcx@msn.com>
> **Subject: Re: TCA - Investigation - BodyArmor SuperDrink**
>
> Marc,
>
> Apologies - legal emergencies.
>
> I will try and reach you tomorrow - understand about holiday time.
>
> Thank you for your patience!
>
>
> Maia C. Kats
> Kaplan Fox & Kilsheimer, LLP
> (202) 669-0658
>
> This message is intended only for the use of the addressee and may contain information that is
> privileged and confidential by law. If you are not the intended recipient, you are hereby notified that any
> review, use, dissemination, or copying of this communication is strictly prohibited. Nothing in this
> communication is intended to constitute any waiver of any privilege or the confidentiality of this
> message. If you have received this communication in error, please notify the sender immediately by
> return email and delete all copies of the message and attachments.
>
>
> _____
> From: Marc x Silver <themarcx@msn.com>
> Sent: Friday, December 13, 2019 4:35 PM
> To: Maia Kats
> Subject: Re: TCA - Investigation - BodyArmor SuperDrink
>
> Maia,
>
> I didn't hear from you on Tuesday,  I will give it one more try but we are headed into the holidays and
> my free time is going to be nonexistent till January pretty soon.
> So if you are serious about continuing our conversation please let me know.

CONFIDENTIAL

1

Thanks

Marc Silver

Sent from my iPhone

On Dec 9, 2019, at 5:04 AM, Maia Kats <MKats@kaplanfox.com> wrote:

Greetings Marc,

Let's talk at 11 PT/ 2 EST on Tuesday instead then.

Does that work?

Thanks.

Maia C. Kats

Kaplan Fox & Kilsheimer, LLP

(202) 669-0658

This message is intended only for the use of the addressee and may contain information that is privileged and confidential by law. If you are not the intended recipient, you are hereby notified that any review, use, dissemination, or copying of this communication is strictly prohibited. Nothing in this communication is intended to constitute any waiver of any privilege or the confidentiality of this message. If you have received this communication in error, please notify the sender immediately by return email and delete all copies of the message and attachments.

_____

From: Marc x Silver <themarcx@msn.com>

Sent: Sunday, December 8, 2019 4:52 PM

To: Maia Kats

Subject: Re: TCA - Investigation - BodyArmor SuperDrink

I might be able to make it work, my wife will be at work all day and I will be home with two of our daughters that are both under three. They are kind of all consuming but I may be able to find something to occupy them, they are in preschool Tuesday through Friday so those days are usually better.

CONFIDENTIAL

2

Marco Silver

Sent from my iPhone

On Dec 8, 2019, at 5:25 AM, Maia Kats <MKats@kaplanfox.com> wrote:

Greetings Marc,

Are you available to speak tomorrow, Monday, at 10 am PT?  (1 EST)?

Thank you.


Maia C. Kats

Kaplan Fox & Kilsheimer, LLP

(202) 669-0658


This message is intended only for the use of the addressee and may contain information that is privileged and confidential by law. If you are not the intended recipient, you are hereby notified that any review, use, dissemination, or copying of this communication is strictly prohibited. Nothing in this communication is intended to constitute any waiver of any privilege or the confidentiality of this message. If you have received this communication in error, please notify the sender immediately by return email and delete all copies of the message and attachments.


_____

From: Marc x Silver <themarcx@msn.com>

Sent: Saturday, December 7, 2019 2:32 PM

To: Maia Kats

Subject: Re: TCA - Investigation - BodyArmor SuperDrink


Maia,

I sent you an email with my contact number and times that I was available, I did not receive any return correspondence or a phone call at the times that I was available.


Please email me back or call me to set up times that I would be able to continue our conversation.


CONFIDENTIAL

3

PL0011

Thanks

Marc Silver

Sent from my iPhone

> On Dec 3, 2019, at 11:41 AM, Maia Kats
> <MKats@kaplanfox.com> wrote:

Greetings Marc,

Would you Kindly either phone me at the below number (before 6 EST), or supply your number so that we might discuss your BodyArmor purchases? As you mentioned, the number you supplied is not authentic.

A thumbnail on my background. I was for many years the Litigation Director for the Center for Science in the Public Interest, and focus my litigation efforts on suits with a strong public health benefit. This case fits that bill.

I look forward to hearing from you.

?

Maia C. Kats

Kaplan Fox & Kilsheimer, LLP

(202) 669-0658

This message is intended only for the use of the addressee and may contain information that is privileged and confidential by law. If you are not the intended recipient, you are hereby notified that any review, use, dissemination, or copying of this communication is strictly prohibited. Nothing in this communication is intended to constitute any waiver of any privilege or the confidentiality of this message. If you have received this communication in error, please

PL0012

notify the sender immediately by return email and
delete all copies of the message and attachments.

PL0013

EXHIBIT

27

### Image 7

## THREE THINGS ABOUT BODYARMOR:

First, let me start off by saying that BODYARMOR is made of natural ingredients, which is really important to me especially because our kids are so little still. I cringe when our daughter asks for "Gator" (Gatorade) at the store, simply because I know it is full of so many sugars and unhealthy preservatives. BODYARMOR is made of mainly coconut water, which makes it not only taste light and refreshing, but also makes it a healthier alternative! The drinks are gluten free, caffeine free, and Certified Kosher.

### Image 8



### Image 9



Case No. 3:20-cv-0633

CLASS ACTION COMPLAINT

EXHIBIT

28

Image J



EXHIBIT

29

Image K



Image L



Image M



Image N



**EXHIBIT**

**30**



EXHIBIT
31



EXHIBIT
**32**





EXHIBIT
34





**EXHIBIT**
**35**



EXHIBIT

36



EXHIBIT

38



EXHIBIT

**39**



EXHIBIT

40





EXHIBIT

**41**

