UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC SILVER, *et al*.,<br><br>Plaintiffs,<br><br>v.<br><br>BA SPORTS NUTRITION, LLC,<br><br>Defendant. | Case No. 20-cv-00633-SI<br><br>**ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 139 |

On December 17, 2021, the Court held a hearing on defendant's motion for summary judgment. For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I. Procedural History

Plaintiffs filed this lawsuit in January 2020. Defendant BA Sports Nutrition, LLC ("BA Sports") is a sports drink company that produces and sells BodyArmor SuperDrink sports drinks ("BodyArmor") with flavors such as Banana Strawberry, Blackout Berry, Fruit Punch, Orange Mango and Grape. BA Sports advertises that BodyArmor provides "superior hydration," and the drink labels contain the words "SUPERIOR HYDRATION," as well as images of fruits, the words "natural flavors and sweeteners," and advertise that the drinks contain "electrolytes," "antioxidants," and various vitamins.

A copy of an "exemplar" product label is reproduced below:[1]

---

[1] The Court previously took judicial notice of this copy of the front and back of an "exemplar" label for the sports drinks. Soffer Decl. Ex. 1 (Dkt. 20-1).



Plaintiffs Marc Silver and Alexander Hill are "sports enthusiasts" who purchased and consumed BodyArmor believing that the drinks were healthy and would benefit their workouts as compared to other sports drinks. The focus of the original complaint was "superior hydration" and the theory that BodyArmor was a "dressed-up soda masquerading as a health drink." Compl. ¶ 12. The complaint did not contain any allegations that plaintiffs were deceived by the labels' fruit imagery or that they believed "natural flavors" referred to fruit flavors.

In an order filed June 4, 2020, the Court dismissed the original complaint with leave to amend. Dkt. No. 40. The Court found that the allegations about "superior hydration" amounted to inactionable puffery because "[p]roduct superiority claims that are vague or highly subjective often amount to nonactionable puffery," while "[a] specific and measurable claim of product superiority based on product testing is not puffery." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997). The Court also held that the plaintiffs' claims that they were misled about

BodyArmor's healthiness were implausible because they were based on puffery ("superior hydration") and because BodyArmor's label truthfully stated its sugar content, including listing sugar as the second ingredient and accurately stating the amount of sugar in each bottle.

On July 7, 2020, plaintiffs filed an amended complaint that included new allegations that plaintiffs were misled by the fruit-based labeling of the drinks and that the drinks did not contain any fruit juice. Plaintiffs also expanded on the allegations that plaintiffs were misled by the labeling to believe that the sports drinks provided health benefits, including adding new allegations that plaintiffs understood hydration to be an objective and measurable attribute. The Court denied defendant's motion to dismiss the amended complaint, finding that "viewed holistically," plaintiffs had stated a claim.

After defendant filed the instant motion for summary judgment, plaintiffs filed an opposition stating, *inter alia*, that they required certain outstanding discovery in order to fully oppose the motion. The Court continued the summary judgment hearing to allow for the additional discovery, and allowed the parties to file supplemental briefs based upon that discovery. Dkt. No. 145. The parties then filed supplemental briefs; plaintiffs stated that, while they still required certain discovery for the case writ large, they did not actually need any outstanding discovery in order to oppose defendant's motion. Dkt. No. 148.

## II.     The First Amended Complaint

The first amended complaint ("FAC") alleges that Silver and Hill perceived hydration to be "an objective and variable attribute," FAC ¶ 53, that Silver and Hill understood BodyArmor's labeling claims "to mean that BodyArmor's capacity for superior hydration was objective and variable in degree and/or measure, and that BA conveyed as much to them intentionally and honestly, justifying the purchase and price premium." *Id*. ¶ 65. Silver and Hill "also understood BA's labeling claims to imply that BodyArmor was good for their bodies and health overall" because of the "superior hydration claims, and/or from the prominent labeling of BodyArmor's high vitamin and purported fruit contents." *Id*. ¶ 71. Plaintiffs allege that in fact, BodyArmor is a sugar-sweetened beverage whose "consumption poses serious health risks to Plaintiffs – health risks that

Plaintiffs did not understand existed given BA's labeling claims." *Id.* ¶¶ 75-76. Silver and Hill "have a favorable view of fruits, believing that natural fruits and fruit juices benefit their health," and they believed that BodyArmor contained real fruit because of the names of the drinks, the images of fruit on the labels, and/or the natural ingredients claim. *Id*. ¶¶ 85-86. Plaintiffs would not have purchased BodyArmor had they understood that the drinks contained very little, if any, of the labeled fruits as ingredients. *Id.* ¶ 92.

The FAC also alleges that Hill saw BodyArmor's non-label advertising in stores, on billboards, television ads, and on social media. *Id*. ¶¶ 95-100. Hill saw this advertising and "understood that BodyArmor was superior at hydrating as compared to other sports drinks, including but not limited to Gatorade, and/or that such superior hydration would translate into correspondingly better workouts and related physical effects." *Id.* ¶ 99.

Silver and Hill seek to represent a nationwide class and several state subclasses. Silver asserts causes of action under the following California consumer protection statutes: (1) the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, for unlawful business practices; (2) the UCL for unfair and fraudulent business practices; (3) the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, for misleading and deceptive advertising; and (4) the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, for deceptive practices in connection with the sale of misbranded products and misrepresentations regarding those products. Hill alleges two causes of action under New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law §§ 349-350, for deceptive labeling and marketing and false advertising. Both plaintiffs allege a claim for unjust enrichment/quasi-contract.[2]

### III.    Plaintiffs' Depositions

####    A.    Hill

At his deposition, Hill testified that when he first purchased BodyArmor in 2012, it was his

---

[2] A third plaintiff, Heather Peffer, asserted claims under Pennsylvania law. Peffer dismissed her claims in November 2020. Dkt. No. 83.

4

practice to read the nutrition label and he would "look for some specific things," including "definitely" "sugar." Hill Depo. at 32-33 (Dkt. No. 140-3). Hill remembered "seeing lots of chemicals, or you know, shortening of chemicals" in the ingredients, and that nothing in the ingredients stood out in his memory. *Id*. at 37-38. Hill stated that he "remember[ed] fruit being on the label, and that was probably the key thing that drew my eye to it in comparison to a Gatorade," and that he thought that BodyArmor's flavor "was real fruit and, like, fruit added." *Id*. at 37. Hill testified that he viewed fruit as important to a healthy diet, that he would occasionally drink fruit juice in 2012, and that he knows "that fruit juices tend to be high in sugars because they're fruits, and those sugars are different." *Id.* 53-56.

Hill testified that since high school[3] he believed that Gatorade was unhealthy because it was "sugar water," that he has been drinking Gatorade "for my whole life," and that when he started drinking BodyArmor in 2012 he continued to buy Gatorade and Powerade. *Id*. at 16-17. Hill stopped drinking BodyArmor in 2017 when he reached "that stage in my life where I started to become a little bit healthier and one of my friends became a much bigger influence in my diet and he kind of started pointing out all the crappy things I was eating." *Id*. at 18.

When asked about how much hydration a man of his age and size would need after an hour-long bike ride, Hill testified, "My understanding of hydration is not a measurable quality at this point. So I don't know how to answer that question." *Id*. at 72. Hill stated he understood hydration to mean "you know, retaining water and retaining a healthy balance in your body between electrolytes, sugars, salts, and water." When asked about why he claimed "superior hydration" was false, Hill stated, "I mean, I'm asserting that if hydration is not a measurable factor, they should not say they can hydrate better than [indiscernable]." *Id*. at 75. Hill testified that "superior hydration" means "it has to be superior to something" but that he did not know what BA was claiming BodyArmor was "superior" to. *Id.* at 75-76; 115-16. Hill was also asked whether "during the period that you were purchasing BodyArmor, do you feel like you got less hydration than you bargained for?" Hill replied, "I don't know how to – I don't know of a way to quantify hydration. So I can't

---

[3] At the time of his December 7, 2020 deposition, Hill was 33 years old. *Id*. at 72.

5

say yes or no." *Id*. at 109.

Hill also testified that he did not rely on any off-label advertising when purchasing BodyArmor. He admitted he never saw any of the YouTube or television ads cited in the FAC as having deceived him into purchasing BodyArmor's products. *Id.* at 25-26. Hill testified that he did not rely on any of the athlete endorsements identified in the FAC, *id. at* 26; he admitted that he had not relied on any of the social media content cited in the FAC, *id.* at 26-27; he testified that he could not remember any specific in-store displays or what they said. *Id.* at 27 ("Q. What did the ad say? A. I do not recall specific things that were written in ads from five years ago."). With regard to the in-store displays, Hill testified that those displays "probably jut reminded me that this product existed over another product" and that, as with any advertising in a store, "those sorts of ads sometimes trigger me to make a point of purchase for a decision like that. I don't know." *Id*. at 29-31.

**B.     Silver**

Silver first bought BodyArmor in 2014. Silver Depo. at 23.[4] Silver testified that he gave the label a "precursory [sic] glance," and started reading the ingredients of foods and beverages in 2017 or 2018 when he became more health conscious. *Id*. at 174, 176-81. After he read the ingredients, Silver stopped drinking the drinks shortly thereafter. *Id.* at 175. Silver testified that when he first bought BodyArmor in 2014, he understood that it contained sugar and he agreed that "part of what you want in a sports drink is sugar because it replaces the – the energy that you are losing when you're working out." *Id*. at 100-02. Silver testified that he has "always known" that sugar was not healthy. *Id*. at 47.

Silver testified that he believed "some fruit juices are healthy or have good attributes and some also have high fructose in them or fruit sugar." *Id*. at 90. He testified that he drank fruit juice

---

[4] Silver was deposed twice. His first deposition occurred the day after Hill's deposition. Plaintiff's counsel obstructed that deposition by making over 200 objections in three hours, including numerous speaking objections. Defense counsel ultimately suspended the deposition and sought relief from the Court. The Court granted defendant's motion for sanctions in part and ordered Silver to appear for a second deposition.

6

as a child but that he no longer drank juice and preferred water, that he thought fruit juices "have too much sugar," and that he tried to avoid fruit juice. *Id*. at 90-91, 96.

When asked whether he shared Hill's understanding that hydration is not a measurable quality, Silver replied "I don't know how to quantify hydration" and that when he purchased BodyArmor in 2014, "[t]hat wasn't even a thought. I was buying a beverage in a store that appealed to me." *Id*. at 168. Silver was asked "What did you understand BodyArmor to be claiming that it was superior to?" Silver answered, "That I cannot tell you because I don't know the answer." *Id*. at 115-16. Silver also testified that felt he was sufficiently hydrated by BodyArmor, "but I am claiming that they may not have superiorly hydrated me." *Id*. at 107, 155-56.

Silver stated that the relief he was seeking in this lawsuit was "[l]ess sugar," [m]aybe a little less deceptive labeling" and "truth in labeling":

> Well, when I first saw BodyArmor, there's fruit all over the label, and I drank it, and it tasted good to me. It tasted like I figured it should.
>
> So I figured that I was getting the benefits that I was supposed to be getting, superior hydration. I didn't take the time, in the beginning, to read how much sugar was in there.
>
> And I'm pretty sure it said that it was naturally flavored, which I took to meant that it was flavored with fruit juices. It sure tasted like it was.

*Id*. at 283-84.

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to produce evidence showing the absence of a genuine issue of material fact. *Id.* at 325. Rather, the burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Id*.

Once the moving party has met its burden, the burden shifts to the non-moving party to

1  "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting then
2  Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must "do more than simply show
3  that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v.*
4  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . .
5  will be insufficient; there must be evidence on which the jury could reasonably find for the [non-
6  moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

7       In deciding a summary judgment motion, the evidence of the non-movant is to be believed,
8  and all justifiable inferences are to be drawn in his favor.  *Id.* at 255.  "Credibility determinations,
9  the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury
10 functions, not those of a judge . . . ruling on a motion for summary judgment . . . ."  *Id.*  However,
11 conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine
12 issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*,
13 594 F.2d 730, 738 (9th Cir. 1979).  The evidence the parties present must be admissible.  Fed. R.
14 Civ. P. 56(c)(4).

## DISCUSSION

### I.  Summary Judgment Based on Plaintiffs' Deposition Testimony[5]

BA Sports contends that each of plaintiffs' claims requires them to show that they relied on and were injured by allegedly misleading or deceptive labeling or advertising, and that plaintiffs' deposition testimony proves that they cannot establish these elements.  BA Sports argues that plaintiffs testified that they read the nutrition facts and yet kept drinking the sports drinks, and that they were not misled by the fruit images, sugar content, or the term "superior hydration."

"California law . . . requires causation – namely, that the plaintiff relied on the misrepresentation on the label." *Hawkins v. Kroger Co.*, 906 F.3d 763, 768 (9th Cir. 2018); *see also Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1020 (9th Cir. 2020) ("Since the passage of Proposition 64,12 a plaintiff must allege actual reliance in order to have standing to pursue UCL

---

[5] BA Sports did not move for summary judgment based on the "reasonable consumer" standard, but rather on the ground that plaintiffs' deposition testimony refutes their claims.

8

and FAL claims."). New York law is in accord. *See Orlander v. Staples*, 802 F.3d 289, 300 (2d Cir. 2015).

The Court agrees with BA Sports that plaintiffs' deposition testimony shows that they did not rely on and were not deceived by any alleged misrepresentations as to "superior hydration." Silver testified that hydration "wasn't even a thought" when he first purchased BodyArmor. Importantly, both plaintiffs testified that they did not know what BodyArmor was claiming to be "superior" to with regard to hydration. Further, both plaintiffs testified – contrary to the one of the key allegations in the FAC that allowed the "superior hydration" claim to survive dismissal – that they did not believe hydration to be an objective and measurable attribute. Indeed, when asked whether they believed that BodyArmor did not provide superior hydration, plaintiffs provided vague, equivocal answers. *See* Hill Depo. at 109 ("Q: Now, during the period that you were purchasing BodyArmor, do you feel like you got less hydration than you bargained for? A: I don't know of a way to quantify hydration. So I can't state yes or no."); Silver Depo. at 107, 155-56 (testified that felt he was sufficiently hydrated by BodyArmor, "but I am claiming that they *may* not have superiorly hydrated me.") (emphasis added). Plaintiffs' testimony demonstrates that they were not deceived by any specific representations about BodyArmor's hydrating qualities. Rather than challenging "a statement that is quantifiable, that makes a claim as to the 'specific or absolute characteristics of a product,'" plaintiffs' claims about "superior hydration" are "general, subjective claim[s] about a product [that is] non-actionable puffery." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008) (quoting *Cook, Perkiss, & Liehe, Inc. v. Northern Cal. Coll. Serv., Inc.*, 911 F.2d 242, 246 (9th Cir. 1990)).[6]

Plaintiffs' deposition testimony also undermines their claims that they were misled about BodyArmor's sugar content. Both plaintiffs testified that they have "always known" (Silver) or known since high school (Hill) that sugar is unhealthy, they knew that BodyArmor was a sports drink that contained sugar when they first purchased the drinks, and they kept drinking BodyArmor. Both plaintiffs read the label when they first purchased BodyArmor – Hill stated he "definitely"

---

[6] The Court hereby incorporates by reference the analysis from the original order dismissing the "superior hydration" claims as puffery.

looked at the sugar content, and Silver stated he gave the label a "precursory glance" but that he knew the drink contained sugar. Hill continued to drink Gatorade, which he described as "sugar water," during the time he drank BodyArmor. Silver testified that he agreed with the statement that sugar is a desirable ingredient in sports drinks. Both plaintiffs testified that they became more health conscious as they got older, and that it was this desire to be healthier that changed their eating and drinking habits. All of this testimony shows that plaintiffs were not misled or deceived as to the sugar content in BodyArmor, and they knew prior to and throughout the time they drank BodyArmor that sugar was unhealthy.

The Court also agrees that Hill's testimony refutes any claim that he relied on off-label advertising to his detriment. At the most, Hill testified that he vaguely remembered seeing some in-store displays, and that those displays "just reminded me that this product existed over another product" and "those sorts of ads sometimes trigger me to make a point of purchase." Plaintiffs' attempts to rehabilitate Hill's testimony are completely unsupported by Hill's deposition testimony and are unpersuasive.

However, the Court concludes that plaintiffs' deposition testimony does not doom their claims that they were misled by the fruit labeling and that they believed BodyArmor contained fruit juice. Plaintiffs testified that the fruit images on the labels drew them to the product and were part of the inducement to purchase the drinks, that they thought fruit was healthy, and that they thought that the fruit flavors of the drinks were "natural" and therefore came from fruit. Defendant argues that plaintiffs must have known that the drinks did not in fact contain fruit because fruit is not listed as an ingredient.[7] However, plaintiffs did not affirmatively testify that they knew the drinks did not contain fruit, and to the contrary, plaintiffs testified that they believed the drinks contained fruit because of the labeling. Defendant also highlights plaintiffs' testimony that they currently do not drink fruit juice. However, plaintiffs both testified that while they do not currently drink fruit juice, during the time they drank BodyArmor, they believed that the drinks contained natural fruit flavors and that they believed this to be a healthy and positive attribute of the drinks.

---

[7] In the exemplar Fruit Punch label submitted by BA Sports, the ingredients do not include fruit but include "Natural Fruit Punch Flavor with Natural Flavors."

10

Thus, the only claims that survive the present motion for summary judgment are plaintiffs' claims that they were misled by the fruit imagery on BodyArmor's labels and that they believed that "natural flavors" referred to flavors from fruit.

## II. Defendant's Other Challenges to the Fruit Labeling Claims

### A.   21 C.F.R. § 101.22(i)

BA Sports raises several other challenges to plaintiffs' fruit claims. First, BA Sports contends that to the extent that plaintiffs' UCL claim is premised on a violation of an FDA regulation, 21 C.F.R. § 101.22(i), that regulation is inapplicable because "sports drinks are not commonly expected to contain fruit juice." 21 C.F.R. § 101.22 is titled "Foods; labeling of spices, flavorings, colorings and chemical preservatives," and subsection (i) provides,

> (i) If the label, labeling, or advertising of a food makes any direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means, or if for any other reason the manufacturer or distributor of a food wishes to designate the type of flavor in the food other than through the statement of ingredients, such flavor shall be considered the characterizing flavor and shall be declared in the following way:
>
> (1) If the food contains no artificial flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name of the characterizing flavor, e.g., "vanilla", in letters not less than one-half the height of the letters used in the name of the food, except that:
>
> (i) If the food is one that is commonly expected to contain a characterizing food ingredient, e.g., strawberries in "strawberry shortcake", and the food contains natural flavor derived from such ingredient and an amount of characterizing ingredient insufficient to independently characterize the food, or the food contains no such ingredient, the name of the characterizing flavor may be immediately preceded by the word "natural" and shall be immediately followed by the word "flavored" in letters not less than one-half the height of the letters in the name of the characterizing flavor, e.g., "natural strawberry flavored shortcake," or "strawberry flavored shortcake".
>
> (ii) If none of the natural flavor used in the food is derived from the product whose flavor is simulated, the food in which the flavor is used shall be labeled either with the flavor of the product from which the flavor is derived or as "artificially flavored."
>
> (iii) If the food contains both a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed by the words "with other natural flavor" in letters not less than one-half the height of the letters used in the name of the characterizing flavor.

11

BA Sports argues that plaintiffs' claims under 21 § C.F.R. § 101.22(i)(1)(i) fail because that regulation only applies "[i]f the food is one that is commonly expected to contain a characterizing food ingredient," 21 C.F.R. § 101.22(i)(1)(i), and sports drinks are "not commonly expected" to contain fruit.[8] As support, BA Sports relies on the declaration of John Sicher, a beverage industry consultant, as well as plaintiffs' testimony that they were not aware of other sports drinks containing fruit.

Mr. Sicher states,

> 1. I am a consultant to companies in, and serving, the beverage industry and am the former editor and publisher of Beverage Digest. I make this declaration based on personal knowledge. If called as a witness, I could, and would, testify competently to the facts stated herein.
>
> 2. I have over 25 years of experience in the beverage industry, including reporting, compiling data, and observing and consulting on industry insights, competitive dynamics, industry operations, and consumer trends. Between 1994 and 2015, I was the editor and publisher of Beverage Digest, a leading journal covering the beverage industry.  After I sold Beverage Digest in 2015 and through 2019, I consulted to The Coca-Cola Company on beverage industry insights and communication matters. I have also consulted to several other companies, including BodyArmor. I consult to BodyArmor on matters unrelated to this litigation.
>
> 3. Sports drinks comprise a multi-billion-dollar per year beverage category in the United States and have been around for more than 50 years, starting with the creation at the University of Florida in the 1960s of a hydration product which was the pre-cursor of Gatorade.  Consumers are very familiar with sports drinks.
>
> 4. Based on my experience and knowledge, I am not aware of any sports drink containing actual fruit, fruit juice or fruit juice concentrate prior to 2019.  I am also familiar with how sports drinks have been marketed and advertised, and I am likewise unaware of any sports drink being promoted, marketed or advertised as containing fruit, fruit juice or fruit juice concentrate prior to 2019.
>
> 5. In 2019 Gatorade launched a sports drink called Bolt24 that contains watermelon juice concentrate. In 2020, Gatorade launched a sports drink called "Gatorade Juiced" that contains various juice concentrates. These are the only sports drinks I am aware of that contain such concentrates, and both products list "juice concentrate" in their ingredient list on the Nutrition Facts panel.  In addition, Gatorade has marketed its Bolt24 product as containing electrolytes from watermelon and has marketed its "Juiced" product as being "juice based" and containing a "blend of fruit juices." Prior to Gatorade's marketing of its Bolt24 and "Juiced" products, no other sports drinks I am aware of were marketed as containing fruit juice or fruit juice concentrates.

---

[8] Plaintiffs correctly note that defendant's motion only addresses subsection 21 C.F.R. § 101.22 (i)(1)(i), and that the FAC alleges a violation of 21 C.F.R. § 101.22(i), and thus embraces subsections (i)(1)(ii) and (iii) as well.  To the extent defendant raises new arguments in the reply brief about subsections (ii) and (iii), the Court finds that this is improper and does not consider them.

12

Sicher Decl. ¶¶ 1-5 (Dkt. No. 139-1). Silver and Hill stopped drinking BodyArmor prior to 2019. *See* Silver Depo. at 22-24, Hill. Depo. at 13-16, 20.

Plaintiffs argue that BA Sports has not presented any evidence about consumer expectations about sports drinks, that plaintiffs have not been able to depose Mr. Sicher, and that Mr. Sicher's declaration is also irrelevant because he opines about a "non-existent category of foods" – sports drinks. Plaintiffs argue that "sports drink" is a category created by the sports drink industry and it is not a food category that has been defined by the FDA.

The Court concludes that BA Sports is entitled to summary judgment on this issue. While plaintiffs criticize Mr. Sicher's declaration, they did not introduce any evidence in opposition to raise a triable issue of fact. Although plaintiffs' opposition complains that plaintiffs have not been able to depose Mr. Sicher or obtain certain discovery from BA Sports,[9] plaintiffs' supplemental reply brief stated that in fact plaintiffs did not require any outstanding discovery to oppose defendant's motion. Thus, the factual record before the Court consists of Mr. Sicher's declaration and plaintiffs' deposition testimony that they drank BodyArmor during a time period when no sports drinks contained fruit juice. In addition, although plaintiffs assert that "sports drink" is too narrow a category, plaintiffs ignore the fact that the regulation provides "strawberry shortcake" as an example of a food that is commonly expected to contain strawberries.

### B.    Preemption

Second, defendant argues that all of plaintiffs' fruit labeling claims are preempted by the Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Nutrition Labeling and Education Act ("NLEA"). The NLEA "established uniform food labeling requirements, including the familiar and ubiquitous Nutrition Facts Panel found on most food packages." *Lilly v. ConAgra Foods, Inc.*, 743 F.3d 662, 664 (9th Cir. 2014). The NLEA also provides that "no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce . . . any requirement for the labeling of food . . . that is not identical to" federal

---

[9] The Court addresses discovery matters *infra*.

requirements contained in the relevant sections. 21 U.S.C. § 343-1. "Not identical to" "means that the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food, or concerning a food container, that: (i) Are not imposed by or contained in the applicable provision . . . or (ii) Differ from those specifically imposed by or contained in the applicable provision . . . ." 21 C.F.R. § 100.1(c)(4). Therefore, state labeling obligations that are "not identical to" those imposed by federal law are expressly preempted.

Defendant argues that plaintiffs' fruit claims are preempted because they are "nutrient content claims" covered by 21 C.F.R. § 101.13(b)(1).[10] The FDA's nutrient content regulation, 21 C.F.R. § 101.13(b)(1), provides in relevant part,

> (b) A claim that expressly or implicitly characterizes the level of a nutrient of the type required to be in nutrition labeling under § 101.9 or under § 101.36 (that is, a nutrient content claim) may not be made on the label or in labeling of foods unless the claim is made in accordance with this regulation and with the applicable regulations in subpart D of this part or in part 105 or part 107 of this chapter.
>
> (1) An expressed nutrient content claim is any direct statement about the level (or range) of a nutrient in the food, e.g., "low sodium" or "contains 100 calories."
>
> (2) An implied nutrient content claim is any claim that:
>
> (i) Describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (e.g., "high in oat bran"); or
>
> (ii) Suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (e.g., "healthy, contains 3 grams (g) of fat").
>
> (3) Except for claims regarding vitamins and minerals described in paragraph (q)(3) of this section, no nutrient content claims may be made on food intended specifically for use by infants and children less than 2 years of age unless the claim is specifically provided for in parts 101, 105, or 107 of this chapter.
>
> (4) Reasonable variations in the spelling of the terms defined in part 101 and their synonyms are permitted provided these variations are not misleading (e.g., "hi" or "lo").
>
> (5) For dietary supplements, claims for calories, fat, saturated fat, and cholesterol may not be made on products that meet the criteria in § 101.60(b)(1) or (b)(2) for "calorie free" or "low calorie" claims, except, in the case of calorie claims, when an equivalent amount of a similar dietary supplement (e.g., another protein supplement)

---

[10] The Court does not address defendant's arguments that plaintiffs' claims are really "health claims" preempted by 21 C.F.R. § 101.14(a)(1) because those arguments relate to the "superior hydration" and sugar claims.

that the labeled food resembles and for which it substitutes, normally exceeds the definition for "low calorie" in § 101.60(b)(2).

Defendant argues that "plaintiffs' claim that the . . . depictions of fruit are misleading because they purportedly state the 'level . . . of the nutrient in the food product,' *id*., is an attempt to impose a new nutrient content claim rule." Mtn. at 23.

The Court finds defendant's arguments unpersuasive. Defendant does not cite any authority for such a broad reading of a "nutrient content claim." Plaintiffs are not challenging any express or implied statements about the level of a nutrient. Rather, plaintiffs claim that the pictures of fruit on the labels, combined with the names of the drinks like "orange mango" and the words "natural flavors," led them to believe that the drinks contained fruit. Further, the Court notes that defendant's arguments about why the nutrient content claim regulation applies are premised on the "holistic" challenge to the labels, including "superior hydration" and the sugar claims; now that those claims have been dismissed, the Court only analyzes whether the fruit labeling constitutes nutrient content labeling, and it does not.

### III. Discovery

Discovery in this case has been exceedingly contentious and fraught. The Court has reviewed the Special Master's Order No. 5, filed April 22, 2022, in which he discusses the state of discovery and what is outstanding. The scope of this case has been narrowed as a result of this order, and the parties are directed to cooperate with each other and to work with the Special Master to determine what outstanding discovery remains relevant in light of the summary judgment order.

### CONCLUSION

For the foregoing reasons, defendants' motion is GRANTED IN PART and DENIED IN PART.

**IT IS SO ORDERED**.

Dated: April 29, 2022

SUSAN ILLSTON
United States District Judge

15